THE CENTRAL RAILROAD vs. ROUSE.

1. In a suit by a wife for the homicide of her husband, the number of minor children is not in issue, nor is their means of support.
2. The declaration set forth a cause of action, and was good against general demurrer, and there is no special demurrer in the record.
3. The evidence was ample to justify the refusal of a nonsuit.
4. In so far as the instructions requested were legal, they were covered by the general charge.
5. The charge of the court touching fault, change of *onus* and presumption, was in accordance with the well-settled law of this State.
6. The measure of damages in an action by a wife for the homicide of her husband, since the passage of the act of 1878 (code, §2971) is not affected by the wants of the family, but depends solely on the value of the husband's life. In estimating such value by age, habits, health, occupation, expectation of life, ability to labor, probable increase or diminution of that ability with lapse of time, rate of wages, etc., the necessary personal expenses of the husband should be deducted; and the balance, reduced to its present value, would be the value of the life.

February 8, 1887.

Husband and Wife.  Railroads.  Damages.  Negligence.
Nonsuit.  Charge of Court.  Homicide.  Before Judge
FORT.  Macon Superior Court.  May Term, 1886.

Lucy A. Rouse brought suit against the Central Railroad
and Banking Company to recover $20,000, alleging, in
brief, as follows: She is the widow of A. J. Rouse.  On
July 13, 1884, her husband was in life and in good health
and vigor, being thirty-four years of age.  He was, at the
time, and had been prior thereto, in the service and em-
ployment of the defendant, a corporation of this State, and
as such, lessee of the Southwestern Railroad, under a lease
made in 1870, and not yet expired.  At the time men-
tioned, the defendant was in full possession, control and
management of the Southwestern Railroad under its lease,
with its appurtenances, and was operating it.  The South-
western Railroad traverses Macon county and crosses Flint
river therein by means of a bridge.  Under his contract
of employment with the defendant and its servant, the
plaintiff's husband was, on the day named, the watchman
at and of said bridge, at his post and upon duty, fully, faith-
fully and carefully discharging the same, as provided by
the rules of the defendant as applicable to him and his
position.  While so stationed and engaged, without negli-
gence, fault or blame on his part, he was instantly killed
through the negligence of the defendant, its officers, agents
and servants, for that on said day the employés and ser-
vants of defendant had carelessly and negligently loaded
the tender of one of its trains with wood taken on to fire
the engine, and had so carelessly and negligently laid the
same, that during the motion of said train the wood was
liable to fall or be thrown off.  The officers, agents and ser-
vants of defendant were further careless and negligent in
running the train, for that its speed in passing over said
bridge, and by the point at which plaintiff's husband was
stationed and engaged, was so great as to be unsafe, and
by reason of the careless and negligent placing of said wood

and overloading said tender, and the careless and negligent running of said train, a certain piece of wood fell or was thrown off and to one side of the track, striking plaintiff's husband on the head and killing him, he being at the time at his post in the discharge of his duty, and wholly without negligence, blame or fault.   Plaintiff and her husband had been married ten years; he had been kind, faithful and affectionate to her, they having lived most happily and having born unto them four children, now living and all minors; and the deceased was the only support, help and protection of plaintiff and her children.   She is damaged by the wrongful and negligent conduct of the plaintiff $20,000.   The defendant has an agent in said county.

The defendant demurred to the declaration, and the demurrer was overruled (as stated in the motion for a new trial, but no demurrer appears in the record).   It then pleaded the general issue.

The evidence for the plaintiff was, in brief, as follows: Her husband was bridge-keeper for the defendant.   His post was at just inside of the bridge proper, within about three feet of the train; his business was to follow the trains through the bridge and stand at his post at the end of the bridge towards which the train was coming.   On July 13, 1884, early in the morning, he went to the bridge.   Most of the witnesses stated that two trains passed that morning; one said that others had passed during the night; and one said that the trains had been delayed in the night for some irregularity, and that he thought there were three trains which passed that morning, the first being a passenger train, and the last a " watermelon train."   Other witnesses stated that the watermelon train followed· the passenger train within from a quarter to half an hour.   A person on board the passenger train testified that he saw the plaintiff's husband after the train passed him; and that he did not follow the train through the bridge, but walked towards the end of it in the direction of his home.   A ferryman near by testified that he saw the deceased walk out in the

direction of the end of the bridge and then return towards his post. Shortly after this, the watermelon train came along. It was running at an unusually rapid speed. One witness thought that it was running faster than he ever saw it before. Another stated that about half a mile from the bridge it was running rapidly and shaking the cars up; that some of the flat cars were "tangled mightily" and looked like they were creening; and that it rather frightened him lest they should jump off the track. Another though it was running about twenty-five or thirty miles an hour. It was Rouse's habit to go home to breakfast after the trains passed. He did not go that morning. After the watermelon train had gone by, a railroad hand came along the track to cross the bridge. No other person had been by. The plaintiff told him her husband had not been home, and he noticed for him, and found him lying just inside the covered portion of the bridge at or very near the point where he usually stood. One witness said he was lying about eight feet from his post, one of his feet being within three feet thereof and the other further away; the left arm was doubled up; the head somewhat twisted to one side. There was a heavy crooked piece of wood lying partly on his head, partly on his shoulder and with the end on the floor of the bridge. A small knot was stuck in his forehead. The wood had the appearance of wood used by the railroad; the witness had previously picked up wood of that kind by the side of the track where it had fallen. Some of the witnesses testified that Rouse was lying behind or under a brace of the bridge, his head and shoulders being on one side of it, his feet on the other. The engineer of the watermelon train had blown his whistle some distance before arriving at the bridge, and, as the witness thought, at or near a wood-rack some distance away. The blowing sounded like blowing for brakes to be put on. One witness said it sounded more like blowing to slacken the speed of the train than to stop it entirely. The successor of Rouse as bridge-keeper testified that he had frequently

seen Rouse stand behind a certain post, and that it would seem that if he were behind the post, he would be safe from any missiles that might fall from the engine or tender; that the bridge had braces at intervals through it; that it was Rouse's duty to stand in there and see that no fire was left on the bridge; that he generally stood on some planks placed there; that witness, being a green hand, generally went up on the enclosed part of the bridge behind the bridge; and that he saw Rouse undressed after he was killed, and besides the wounds on his head, there were other bruises, one being on his left shoulder near the back. There was a mark or indentation on the wall, about three or four feet from the brace, and one on the inner side of the brace three or four inches lower than that on the wall of the bridge and about the height of Rouse's head if standing. These marks were colored as if made by charred wood. A physician, who was a witness, testified that, from the position of Rouse and of the marks on the bridge, it was his impression that Rouse was standing in front of the bridge; that the wood struck the side of the bridge and turning in and rebounding, struck the brace; that it might, in his opinion, have gone through the opening behind the brace (by turning endwise) and killed a man on the other side, one end striking the wall and the other the brace; that he did not think it possible for human force to have produced the wounds found on Rouse's head; that the bones of the skull were too badly broken for it to have been caused by a lick from a man; that his impression was that if the wood fell off the tender, it was owing to the velocity of the train; that he did not think a man could throw with the force indicated by the indentation in the wall; that his opinion was that the piece of wood went behind the brace, and while it might have struck Rouse if he was sitting down there, his head would, if he were sitting, be about half way up to the indentation, and if he were standing his head would be about up to the height of the marks. He did not think that, if the billet of wood had

struck the side of the bridge and the brace and then fallen
on a man sitting or lying down there, it would have frac-
tured his skull to the extent to which it did.    There was a
good deal of speculation and opinion as to whether it was
possible for the wood to have struck the bridge at the points
indicated, and passing through, struck a man on the side
on the head, or whether the man could have been struck,
knocked through the space between the brace and the
side of the bridge and have the wood to follow and remain
upon his head in the position in which it was found.    One
witness said that if a man was standing at a point indicated
and the wood struck him on the head, it was possible for
it to follow him to the floor and rest on his head, but it
might not happen again in a hundred times.    A witness
testified that he thought he had seen the billet of wood
before; that he did not know that it was the same piece
of wood that he put in the wood-rack once, but some one
threw it out, it being too crooked, and he cut off the end
and put it in the rack Saturday morning; that on the next
morning, he was at the rack and the wood was not there;
and that he next saw it in the office of the clerk of the
superior court.    The plaintiff testified that her husband
had no money in his pockets; that he generally carried a
small purse, but when he was brought home, she did not
see it.    There was other testimony as to the expectancy of
Rouse and the amount of his earnings.    The plaintiff tes-
tified that they had four children and had been married
about ten years.

The plaintiff closed.    The defendant moved for a non-
suit, which was refused.

The evidence on behalf of the defendant was, in brief,
as follows: Three trains passed over the bridge early on
the morning when Rouse died.    The first was a freight-
train, the engineer and fireman of which testified that they
saw Rouse on the bridge, standing from eighteen to
twenty-five yards from the end of it; that they saw him

as the train passed him, and nothing from it struck him; that they took on about a quarter of a cord of wood at the wood-rack about three miles from the bridge; that the fireman put about half of it into the furnace, and put in the other half before reaching the bridge, leaving none of that wood in the tender when they arrived at the bridge. The engineer said that the stick of wood produced in court was not on his engine if it came from the wood-rack mentioned. The passenger train was the next to pass the bridge, and did so about 5:40 or 5:50 in the morning. The engineer of that train testified that he was not acquainted with Rouse; that he saw a man standing about midway of the bridge whom he took to be Rouse; that, so far as he saw, nothing from his train struck the man, who was left standing there; that his train took on no wood at the wood-rack not far from the bridge, known as Dorsett's rack. The third train was the watermelon train. This had been running in advance of the passenger train, but being heavy, was delayed and became the last of the three. The engineer testified that he followed the passenger train shortly; that his train was running on an average about twenty-five miles an hour, and he thought he was probably six or seven minutes behind the passenger train when he reached the entrance to the bridge; that the rule-book limited his running to twenty-five miles an hour on the open road, and to eight and not exceeding fifteen miles an hour in crossing bridges; that in cases of emergency he could go as fast as fifteen miles an hour, and he thought that was about the speed in passing the bridge on that morning; that the rule-book required the engineer to use all precautions in loading the tender so that no wood would fall off, and he did so; that he looked out for Rouse in passing the bridge, as he always did, but did not see him that morning. Both he and the fireman testified that no wood was taken on their tender at Dorsett's wood-rack, nor had any been taken on within thirty miles of the bridge; that the wood last taken on was split pine; that

the tender was not overloaded, and they did not think there was any chance for wood to fall from it. Wood sometimes falls from the tender, but generally only a few inches out from the track. It was impossible for wood to go out from the train, but it would take the same direction with the train, and with the fall and momentum would fall about six or eight inches away. The top of the tender of an engine is some seven or eight feet from the track and has a rim or edge around it. The tender extends some eighteen or twenty inches beyond the track, and the outer edge of the rim about twenty-three inches over the rail. There is no upright post standing in the bridge, but there are braces along the entire length. A witness who measured the distance testified that from the mouth of the bridge to the brace was eighteen feet; that the brace was eighteen feet long and at the bottom was twenty six and a half inches from the side of the bridge, sloping from that point until it joined the side of the bridge; that the bridge was fifteen feet wide and the track about five feet wide; that from the track to the wall of the bridge was five feet, and it was two and a half feet from the foot of the brace to the track and about three feet from the track to the inside of the brace; that the floor of the bridge was about eight or ten inches lower than the track; that at the height of a man's head the space between the brace and the side of the bridge was about eleven and a half or twelve inches; that he noticed some indentation in the wall, also on the post; that on the latter there is more than one, and there is not a brace on the bridge which does not bear indentations from being scraped, or struck, or something; that the indentation referred to as being on the brace was on the inside on the corner; that the only indentation on the wall still left, instead of projecting towards the brace, extended upwards; that he had no idea that the same thing which made the indentation on the post made that on the wall, or that the piece of wood could have made the indentation on the post, nor did he think it could have made the one

on the wall; that if the piece of wood had been projected and struck centrally, he thought it would have rebounded, but, if it had struck glancingly, it might not have rebounded, but dropped through; that he did not see how the piece of wood, being hurled forward, could have gone through the space between the brace and the bridge; that it would have been possible, but not at all probable; and that the marks were about six feet from the floor. Other witnesses estimated the distances about the same or slightly different, one stating that at the marks the space between the brace and bridge was about 14 or 14½ inches. Another witness testified that it was about seven o'clock in the morning when he saw Rouse dead, and he thought the watermelon train had passed about a quarter of an hour before, and that it passed after the passenger train, may be half an hour. Another testified that, on the evening before Rouse's death, the latter had a dollar in a little purse in his pocket; that one of the hands asked him for change, and Rouse responded that he had only a dollar, and that the hand gave him two quarters, saying that it was in payment for some fish; that he could not swear that the purse was not on Rouse's person when he was found dead, but when he was shrouded, the witness examined his clothes and did not find any purse or money, and did not think there had been any opportunity for anything to have been taken from the pockets without his knowledge; and that Rouse's keys were found about eight feet from his hands. Another witness testified that, after Rouse's death, he thought the watchman nailed up some planks or a screen as a protection, and would get behind them when the trains passed; that there was no particular rule as to whether the watchman should stand so that he was at the bridge when the trains passed and went over it after them; that there was no post laid out where he should stand, but he was generally at the end of the bridge when the train approached, and then followed it. Another testified that he measured the wood, and it was two feet one

and a half inches one way, about fifteen and a half inches another way, and ten and a half inches another; that Rouse was a small, ordinary-sized man; that the billet of wood, measuring about ten inches one way, might go through an opening twelve inches wide. The engineer on the watermelon train stated that the negro wood-passer on his engine was not the regular wood-passer, and had since gone to Alabama. Blood was found on the floor of the bridge where Rouse's head was lying and splashed on the side of the bridge a few inches from his hand. The track had been raised a few inches since the death of Rouse.

In rebuttal, the plaintiff, on reflection, testified that the washerwoman who washed her husband's clothes which he had on that day, gave her his purse Saturday evening or night; that he had given her what money he had, and had none, but kept a little buckskin purse; the latter he did not have when brought home. She stated also that her husband had a bunk for sleeping about midway of the bridge, and slept there every night. A witness for the plaintiff testified that he had measured the brace, and that at its foot it was two feet and three inches from the wall of the bridge; that the indentation on the edge of the brace was about six inches higher than the head of a man; that there was a slight difference in the height of the floor at the two sides of the brace; and that from the indentation on the brace to the wall was about thirteen inches, and the piece of wood could go through that space. Another witness testified that the distance from the brace to the bridge was about thirty-two inches and the space at the height of the indentation was thirteen inches, and the piece of wood could be thrown there in a way indicated by him; that he did not know whether the place where Rouse was found would be a place to sleep or not, but thought it would hurt a man's back if he lay there long, and did not think it a good place to sleep; and that a pool of blood was found on the floor of the bridge where the head of Rouse was lying, and blood was splashed against the wall a few

inches above his head. There was some testimony as to the amount the plaintiff's husband earned, the amount of his personal expenses, and the amount he furnished to his family.

The jury found for the plaintiff $4,000. The defendant moved for a new trial on the following grounds:

(1)–(4.) Because the verdict was contrary to law and evidence, and was excessive.

(5.) Because the court overruled the motion for a non-suit.

(6.) Because the court overruled the demurrer to the plaintiff's declaration.

(7.) Because the court, over the objection of defendant's counsel, allowed plaintiff to amend the declaration by alleging that her husband and herself had four minor children dependent upon him for maintenance and support.— Said amendment was objected to as illegal and contrary to law.

(8.) Because the court erred, after allowing said amendment, in permitting plaintiff to submit proof of the fact that her husband and she had four minor children dependent upon him for maintenance and support.—The objection was that such evidence was illegal and calculated to increase the finding of the jury.

(9.) Because the court erred in charging the jury as follows: " Under our law, the plaintiff may recover the full value of the life of the deceased, as shown by the evidence. To reach a just conclusion in a suit brought by a wife for the homicide of her husband, if he appear to have been without fault, the jury are to inquire what would be a reasonable support for the wife and children according to the circumstances in life of the husband, as they existed at his death, and as they may be reasonably supposed to exist in the future, in view of his character, habits and occupation and prospects in life; and when the annual money of that support has been found, to give as damages its present worth, according to the expectation of the life

of the deceased, as shown by the *indicia*, would be a fair rule."

(10.) Because the court erred in charging the jury as follows: " While, in order for a railroad employé to recover against the company for an injury sustained in connection with his employment, he must be blameless in connection therewith and the company negligent, yet when the employé shows either that he was blameless or the company negligent, a presumption of the other arises, and the *onus* of proof is shifted to the defendant. To state the proposition in another form : If Mrs. Rouse has shown you that the homicide of her husband was caused by the railroad company, and that, at the time of the homicide, her husband was without fault and blameless, the law then presumes, until the contrary appears, that the company was to blame; or, if she has shown to you, on the other hand, that the company was to blame, was guilty of negligence, the law then presumes, until the contrary appears, that he was not to blame. So that, in order for the plaintiff to make out a *prima facie* case, she must go no further than to show by evidence one or the other of these two propositions—either that he was not to blame, or the company was."

(11.) Because the court erred in refusing to give in charge to the jury the following : " If you believe that the defendant's agents exercised all reasonable care and diligence in loading the tender with wood, and ran the train in a prudent, careful manner, and was guilty of no negligence, then the plaintiff cannot recover in this case."

(12.) Because the court erred in refusing to give in charge to the jury the following : " You will reconcile all the testimony of all the witnesses, allowing each witness to speak the truth, the law not imputing perjury to either, and in doing that, if you shall conclude that the piece of wood was not on the tender of the last train, then you should find for defendant."

(13.) Because the court erred in refusing to give to the

jury the following charge in the language requested, to-wit: "There is but one ground on which an employé can recover, and that is when there is no fault on his part—when he is entirely faultless.   Therefore the employé must exercise ordinary care and diligence to prevent an injury to his person; he must be wholly without fault.   If both are at fault, if he contributes anything in the way of neg-ligence, and the employé is also at fault, then he could not recover.   If neither is at fault, and the company show they have exercised reasonable care and diligence, then he could not recover, because it would be an accident.   He must show that he is without fault and the burthen is upon him."

(14.) Because the court charged as follows: "Yet when the employé shows either that he was blameless, or the company was negligent, a presumption of the other arises, and the *onus* of proof is shifted to the defendant."

(15.) Because the court charged as follows: "Or, if the plaintiff has shown to you, on the other hand, that the company was to blame—was guilty of negligence,—the law then presumes, until the contrary appears, that he was not to blame."

The motion was overruled, and the defendant excepted.

LYON & GRESHAM; E. A. HAWKINS, for plaintiff in error.

GUERRY & SON; B. P. HOLLIS; E. G. SIMMONS, for de-fendant.

BLECKLEY, Chief Justice.

1. In a suit by a wife for the homicide of her husband, the number of minor children is not in issue, nor is their means of support.   The 7th ground of the motion for new trial complains that the court permitted an amendment to be made to the declaration, introducing the children into the case and alleging something in relation to their support. The declaration, we find, does mention that there are four

minor children, and that they and the plaintiff were dependent upon the deceased for a support. That is not matter upon which an issue could arise in such a case. It did no harm, however, to introduce the names and number of the children into the declaration, because the statute contemplates that the recovery had, if any, shall descend to the wife and children, just as though the husband had left that much estate in personalty of any sort. The mention of the children in the declaration would serve as a sort of register of the persons interested in the recovery. There was probably no impropriety in mentioning the children.; but it was not matter that was necessarily to be presented in the declaration. No issue could be taken on it properly; and while we rule that it did no harm, and is not matter for reversal, we hold that it was not essential in any respect to the case. Complaint is made (and we intend this ruling to cover that point also) in the 8th ground of the motion for new trial, that evidence was admitted as to the support of the children and wife. We think this evidence was altogether irrelevant, and ought to have been excluded. Yet its admission in such a case as this would furnish no cause for new trial, if no more important error had been committed.

2. The declaration was demurred to and the demurrer overruled. Without considering whether that was proper matter for a motion for new trial (and it is not otherwise presented in this case), we hold, that the declaration set forth a cause of action, and was good against general demurrer; and there is no special demurrer in the record. If there had been a special demurrer, there was nothing for it to affect except the irrelevant allegation touching support of the children and wife.

3. A motion was made for nonsuit, and overruled. We think the evidence was ample to justify the denial of a nonsuit. The evidence showed that a certain piece of fuel that ought never to have come in contact with the bridge-keeper's head had killed him. The place for that fuel

was either in the wood-rack some miles distant from the bridge, or on the tender, or in the furnace; and it was found shortly after the passing of trains lying in the bridge, this man lying there with it, dead, his head mashed with that piece of wood. The wood was so much out of place, and the accounting for its being there was so imperfect, even to the last, that the jury were well warranted in concluding that it came there by the negligence of the railroad company, in the manner alleged in the declaration, and that it killed the plaintiff's husband in consequence of that ' negligence. There is some mystery about the case; but juries have no more important function than to solve mysteries; and we cannot say that they rendered any improper solution in their verdict, but, on the contrary, can say that when the plaintiff closed her evidence, the jury could well conclude that there had been negligence. The motion to nonsuit the case was, we think, founded on an entire misconception of the strength of this evidence.

4. Certain requests to instruct the jury were made by the defendant's counsel and denied. They are set forth in the 11th, 12th and 13th grounds of the motion. In so far as they were legal, they were covered by the general charge. There is one of them embraced in the 12th ground, which has a tail to it that involved the decision of a question of fact by the judge. That part of the request invoked an instruction to the effect that, unless the injury was caused by the last train of three, there could be no recovery. Suppose the facts show that it was the last train, if any. It was not for the judge to determine what train it was; and the request, as to that part of it, was founded upon the theory that the judge could sit there and hear the evidence, and push out of the case with his own mind all of it but what he thought was the real cause of the injury complained of, which he had no power to do.

5. The charge of the court touching fault, change of *onus*, and presumption, was in accordance with the well-settled law of this State. The 10th, 14th and 15th grounds

of the motion for new trial are virtually an attack upon
some half dozen decisions, or more, rendered by this court
with reference to what will change the *onus* in an action
by an employé of a railroad, or his widow, and what will
not, and on the effect of proving fault in other employés
of the railroad in relieving the injured employé from the
presumption of fault on his part, etc.   Of course it is idle
for this court to be constantly repeating its well-considered
rulings on any question; and we simply pass these grounds
with the remarks that I have made.

6. The measure of damages in an action by a wife for
the homicide of her husband, since the passage of the act
of 1878 (code, §2971), is not affected by the wants of the
family, but depends solely on the value of the husband's
life.   In estimating such value by age, habits, health, oc-
cupation, expectation of life, ability to labor and to furnish
care and attention to the family, probable increase or
diminution of that ability with lapse of time, rate of
wages, etc., etc., the necessary personal expenses of the
husband should be deducted, and the balance, reduced to
its present value, would be the value of the life.   The 9th
ground of the motion for new trial sets forth a part of the
charge of the court complained of, which recognizes an
estimate made upon what would be required to support
the wife and children, in arriving at the amount of dam-
ages.   We hold that this element has nothing whatever to
do with the question.   If a man's family is expensive or
inexpensive, and he is killed without any justification, his
wife, if she sues alone, or his children, if he has no wife,
can recover the value of his life; it matters not how they
have been accustomed to be supported, or what their
wants are or have been.   It is simply a question of valu-
ing that man's life; and in making such valuation, he ought
to be treated as any other producer, chargeable upon his
income with his personal expenses—his own individual
personal expenses.   These would diminish his value to his
family or his estate.   Ascertain what his value to his

family, including his earnings or income, would be, arrive at the gross amount, then deduct from it what he would have to lay out as a producer to render the service or to acquire the money that he might be expected to produce, reduce the whole net result to its present value, render a verdict for it, and the recovery would be sustainable. 73 *Ga.* 325.

Solely because of error in charging the jury as set forth in the ʒth ground of the motion, the judgment of the court below is reversed.