Annie E. McCabe *vs.* Narragansett Electric Lighting Company.

PROVIDENCE—OCTOBER 15, 1904.

Present: Tillinghast, Dubois, and Blodgett, JJ.

(1) *Negligence.*

In an action for negligence arising from the burning out of a transformer of defendant, whereby an excessive current of electricity was let into the premises of plaintiff, which were wired and insulated for a low voltage which plaintiff had contracted with defendant to receive, evidence considered, and:—

*Held,* to sustain verdict.

(2) *Evidence. Expert Witnesses.*

An expert witness may be properly interrogated to show his familiarity with the condition of an art as theoretically stated by scientists engaged in the investigation of the practical application of the same to the affairs of human life.

(3) *"Death by Wrongful Act." Measure of Damages.*

The measure of damages, in an action under Gen. Laws cap. 233, § 14, for the recovery of damages for death caused by the "wrongful act, neglect, or default of another" is the pecuniary loss sustained. Nothing can be given by way of solace for wounded feelings or for the bereavement suffered or for the pain and suffering of the deceased, and nothing for loss of society

of the husband and father. The loss sustained by the parties plaintiff in such action is the present value of the net result remaining after the personal expenses of deceased are deducted from his income or earnings, ascertaining the gross amount of such prospective income or earnings and deducting therefrom what deceased would have had to lay out to acquire the money that he might be expected to produce.

TRESPASS ON THE CASE for negligence. Heard on petition of defendant for new trial, and granted on question of damages.

BLODGETT, J. This is an action of the case for the recovery of damages for the death of the plaintiff's intestate, Thomas E. McCabe, her late husband, on September 16, 1903, from an electric shock, alleged to have been caused by the negligence of the defendant. At the trial the jury returned a verdict for the plaintiff for the sum of $19,000, and the case is now before us on the defendant's petition for a new trial. Briefly stated, the undisputed facts are as follows:

(1)   The plaintiff's intestate was at the time of the accident the proprietor of a stable at Riverpoint, and in the month of August his premises had been wired for electricity, which was furnished by the defendant corporation. The company sent out from its station in Providence a current of two thousand volts, which was stepped up, or converted by transformers, into eleven thousand volts, and was carried at that voltage to the substation at Apponaug, and then at the substation at Apponaug it was stepped down again, or transformed, into two thousand volts, and at that voltage was sent throughout the town of Warwick and the Pawtuxet Valley; and when it was desired to send the electricity into a building for the purpose of lighting incandescent lights, it would be further converted by a transformer into a current of one hundred and four volts and thus delivered to their customers, of whom McCabe was one. The entire building had been wired, and the light which caused the trouble was located in the washroom of the stable. On the evening of September 16th, at about 8:45 P. M., one McMann went to the stable to get a board. To get this board McCabe went to the washroom, by the door of which stood McMann. What happened next is thus told by the latter:
"Q. 6. What happened? A. Well, he went in there to

get a board for me. I had a window broken in my barber shop that night, and, as I say, he went in to get a board, into this storeroom, and by going through the washroom there was a light hanging there, and he went to turn this light on, he reached up to turn the light on, and as he did I saw a spark come out of one of his hands, I don't remember which, and he made a grunt, 'Oh!' and lay there on the wire. I hollered to turn the switch off, to my brother."

Peter Massie was also with McMann when the accident happened. He testifies: "When he turned the light on he got hold of the wire to take a knot out, to work in the back room with it, and as he did I saw a blue flame coming out of his arm, and I grabbed hold of him to pull him away, and as I did so I got a shock."

At the time of the accident the transformer, which was used to reduce the current to one hundred and four volts for the McCabe stable and a few other buildings in the immediate vicinity, had burned out, which resulted in letting the alternating current of two thousand volts into the wiring of the stable. This condition was not known to the defendant company, or to any one, prior to the accident to McCabe.

A transformer, such as the one in this case, is made up of two coils of insulated wire, one coil having twenty times as many turns of wire as the other coil. The coil with the greater number of turns is connected with the high voltage or "primary" wires which come from the substation at Apponaug to the transformer, and the other coil is connected with the low voltage, or "secondary," wires which run from the transformer to the interior of the buildings lighted. These two coils are not connected, but are very carefully insulated from each other. Electric force thus passes from the large coil to the small coil by induction, the number of times the current is thereby reduced being determined by the relative number of turns of wire on the two coils.

The first and second grounds for a new trial are set forth in the petition, as follows:

"First. Because said verdict is against the law and the evidence and the weight thereof.

"Second.   Because the testimony shows that the defendant was not guilty of negligence."

Neither one of these grounds can be sustained.   It was not disputed that the defendant had contracted to furnish and the plaintiff's intestate had contracted to receive a current of only one hundred and four volts, and that the premises in question were properly wired and insulated for a current of that voltage.   Neither was it disputed that a current of not more than three hundred volts is harmless;  that death can not be caused by a current of less than five hundred volts, and that the shock which caused the death of McCabe was approximately two thousand volts.   It was not denied that the transformer from which the current entered McCabe's premises was made in 1893;  that it was never inspected by the defendant after having been placed in position;  that there were no lightning arresters in this vicinity, no fuses, nor grounding of the secondary wires;  that the oil requisite for the proper action of the transformer had not been kept replenished; and that the transformer was originally made for an alternating current of one hundred and twenty-five cycles, which had been changed to a current of sixty cycles, thereby impairing the efficiency of the transformer; and, even more than this, that, whereas approximately twenty lamps were what is technically termed a proper "load" for a transformer of such type, yet here more than sixty lamps were supplied from this transformer, of which lamps, on an average, practically thirty were simultaneously in use at night.

It would serve no useful purpose to recite all the testimony in detail upon these points, and we are content to say that all these facts are abundantly established by the evidence, and many of them are so established from the lips of the witnesses for the defence.

Thus the testimony of the witness Fenner, the superintendent of the defendant's lines in the territory in which McCabe's premises were located, is as follows  (p. 286): "C. Q. 74. You had there an old transformer?  A.  Yes, sir.  C. Q. 75. No grounds?  A.  No, sir.  C. Q. 76.  No fuses?  A.  No,

sir. C. Q. 77. No lightning arresters in that vicinity? A. No, sir."

And the testimony of James E. Cole, an engineer with eighteen years, experience in electrical affairs, the chief inspector of the engineering department of the city of Boston, called by the defendant as an expert witness, upon cross-examination, was thus given: "C. Q. 130. If this transformer was kept filled with oil, would it have been as apt to burn out? A. No, sir. C. Q. 131. From any source? A. No, sir. C. Q. 132. Would you say it was a good practice to put upon that transformer, a one hundred twenty-five cycle transformer, sixty-four lights, over thirty of which were lighted continuously almost every evening? A. As you state it, no, sir. C. Q. 133. That would be apt to weaken the transformer? A. Yes, sir, it would. C. Q. 134. So it would more easily burn out? A. It would. C. Q. 135. The secondaries, grounding them is the best means of preventing too great a current from going into a building over the secondary wires, is it not? A. I think I know what you mean, and I will answer it the way you mean, it is the best way I know of. C. Q. 98. Now are fuses in common use on transformers? A. They are. C. Q. 100. They are in use by all electric lighting companies, are they not? A. No, sir. C. Q. 101. Practically all, so far as you know? A. Yes, sir. C. Q. 102. And you think it is something that should be there? A. I do. C. Q. 103. And it helps to save the transformer? A. It does. C. Q. 104. It helps to keep it from burning out? A. It does. C. Q. 109. Lightning arresters were in common use in 1903? A. They were. C. Q. 110. Very common use? A. Fairly common; yes sir, very common. C. Q. 114. Was there any material difference of opinion in the year 1903 as to the grounding of secondaries as a means of safety to life? A. I do not know. C. Q. 115. Do you think so? A. I think that probably a majority were in favor of grounding them at that time. C. Q. 116. The vast majority, were they not? A. I should not say vast; I should say the greater majority. C. Q. 117. The fire underwriters recommended it? A. Permitting and recommending it, yes sir. C. Q. 118. And this electric asso-

ciation, say back in 1899, recommended it? A. In their final report they did; yes, sir. C. Q. 119. Away back in 1899? A. Yes, sir."

And the testimony of the witness William C. Woodward, the electrical engineer for the defendant for the last four years, is as follows, upon cross-examination: "C. Q. 140. Now, what inspection of your transformers do you have? A. After they are placed in shape? None. C. Q. 141. Absolutely none? A. No, sir. C. Q. 142. They are left there until they burn out? A. Until they are removed for some cause. C. Q. 143. Until some customer says there is trouble with their line, or when a man has been killed? A. When a report of trouble comes it is investigated, and, if the transformer is faulty, it is removed. C. Q. 144. But up to that time no inspection is made, and it may consist of trouble with the light or some complaint of somebody having had a shock? A. It may. C. Q. 162. In October, 1903, didn't you testify 'that the grounding of the transformer is the only device and the best device to save human life?' A. I did."

And finally, the testimony of the witness Walter R. Eaton, an electrical engineer for eighteen years for the Electric Lighting Company, of Cambridge, Mass., called by the defendant as an expert, upon cross-examination as to the alleged overloading of the transformer supplying the McCabe premises, and which was conceded to be a twenty light transformer, is as follows: "C. Q. 38. If the saloon had eight lights, the barber shop had three, and, in addition to that, there was a hose-house which was lighted all the evening, every evening, five lights, a livery stable which had five or six lighted every evening, that makes a total of twenty-one or twenty-two, and, in addition to that, there was a residence with nineteen lights and another residence and an office with twenty-five lights, and a barn with two lights, how many light transformers would you say it would take to supply that number of lights? A. I should put up a fifty light transformer. C. Q. 39. Would that supply if the transformer was a one hundred and twenty-five cycle? A. Yes, sir. C. Q. 41. And you would have a sixty cycle current on it? A. Yes, sir."

The third and fourth grounds are as follows:

" Third.   Because the testimony shows that the plaintiff's intestate assumed the risk of the injury.

" Fourth.   Because the testimony shows that the plaintiff's intestate was guilty of contributory negligence."

To these it is sufficient to reply that he did not assume the risk of injury resulting from the unauthorized and unexpected discharge of a current of two thousand volts when the defendant had agreed to furnish him a current of but one hundred and four volts.   Inasmuch as the evidence is not disputed that a current of but one hundred and four volts was harmless, even to use standing on a wet floor, McCabe can not be said to have in any way contributed to the defendant's act in sending a current of two thousand volts into his premises.

The fifth and sixth exceptions are as follows:

" Fifth.   Because the court erred in permitting the witness Duffy to testify as a general expert in electrical matters.

" Sixth.   Because the court erred in permitting the witness Duffy to testify as to the custom of hanging lights, in answer to question 193, page 48, of the record.

We are of the opinion that the witness was sufficiently qualified to express an opinion upon the matters in question. And we here observe that the record shows an abundance of evidence to the same effect as the testimony given by Duffy, from expert witnesses whose qualifications were and are unquestionable.

The seventh exception is as follows:

(2) " Seventh.   Because the court erred in permitting the expert witness William L. Robb to testify regarding the recommendations of the American Institute of Electrical Engineers, in answer to question 232, page 97, of the record."

As an answer tending to show the familiarity of the witness as an expert with the condition of the art, as theoretically stated by a body of scientists engaged in the investigation of the practical application of electricity to the affairs of human life, we think the question was a proper question, and overrule the exception.

The eighth ground of exception is not pressed.

The ninth ground of exception was the alleged error of the court in refusing to charge: "If the light was installed under the direction of plaintiff's intestate, and such installation was dangerous, and contributed to the accident, then the plaintiff's intestate was responsible for the result of such faulty installation."

It is sufficient to say that the evidence indubitably showed that the premises were wired and insulated for a current of only one hundred and four volts, and that for that purpose they were properly wired and insulated, and that the premises in question were not wired and insulated, or intended or designed, for a current of two thousand volts. It accordingly follows that the instruction in question should have been denied, as irrelevant to the issues and the testimony as presented.

(3)   The twelfth exception is that the damages awarded are excessive. This exception we find to be well taken, and before we proceed to a consideration of that question, we here express our unqualified disapproval of the language used by the counsel for the plaintiff in his argument to the jury as set forth in the tenth exception.

The cause of action is the statutory action given by sec. 14, cap. 233, Gen. Laws, for the recovery of damages for death caused by "the wrongful act, neglect or default of another," and the measure of damages in this form of action is the pecuniary loss sustained. Nothing can be given in this action by way of solace for wounded feelings or for the bereavement suffered, or for the pain and suffering of the deceased, and nothing for loss of society of the husband and father. It closely resembles in this respect the case of *Schnable* v. *Providence Public Market*, 24 R. I. 478, which was an action by a father for damages for the loss of service by reason of the wrongful death of his minor son. Obviously, then, when the fact of liability is established, the question of damages becomes as nearly a question of arithmetical computation as the circumstances of the case as disclosed by the evidence will permit, and, consequently, the rule of damages differs from that which

obtains in other tort actions, such, for example, as slander, libel, assault, and false imprisonment.

It is obvious, too, that the loss sustained by the plaintiff here is the present value of the net result remaining after his personal expenses are deducted from his income or earnings. To ascertain this it is, of course, necessary to ascertain first the gross amount of such prospective income or earnings, then to deduct therefrom what the deceased would have to lay out as a producer to render the service or to acquire the money that he might be expected to produce, computing such expenses according to his station in life, his means and personal habits, and then to reduce the net result so obtained to its present value: *Central Railroad* v. *Rouse,* 77 Ga. 393; *Harrison* v. *Sutter Street Railway Co.,* 116 Cal. 156; *Ohio & Mississippi Railway Co.* v. *Voight, Adm.,* 122 Ind. 288.

In the case at bar there was no evidence offered for the consideration of the jury as to such personal expenses of the deceased; and even if it be conceded that the amount awarded was justified by the evidence as the gross amount of the prospective income of the deceased, on which we express no opinion, it follows that this result must have been reached by the jury, even if uninfluenced by the observations of the plaintiff's counsel in his argument, without the presentation of evidence as to the personal expenses of the deceased as above stated, and hence is incorrectly reached.

The liability of the defendant corporation in this case being clearly established by the evidence, we are of the opinion that both parties are entitled to the benefit of the judgment of a jury upon the amount of damages sustained, which are to be computed according to the rule above laid down.

The case will therefore be remitted to the Common Pleas Division for a new trial upon the single question of the amount of damages to which the plaintiff is entitled.

*P. Henry Quinn, David S. Baker, and Lewis A. Waterman,* for plaintiff.

*Vincent, Boss & Barnefield, and Edward D. Bassett,* for defendant.