523 So.2d 1042 (1988)
Elma TATUM, as administrator of the Estate of Dixie V. Tatum, deceased
v.
SCHERING CORPORATION.
86-536-CER.
Supreme Court of Alabama.
March 18, 1988.
Frank M. Wilson of Beasley, Wilson, Traeger, Allen, and Mendelsohn, Montgomery, for appellant.
Jean-Pierre Garnier, Falls Church, Va., and Stanley A. Cash of Huie, Fernambucq & Stewart, Birmingham, for appellee.
MADDOX, Justice.
The United States District Court for the Middle District of Alabama has certified these questions:
"1. Given that only punitive damages are recoverable in an Alabama wrongful death suit and that punitive damages are not apportionable among defendants according to fault, or for any other reason, and that the decedent's personal representative has already been paid for alleged wrongful acts of other defendants which resulted in the death of plaintiff's decedent, what is the effect of pro tanto settlements by two defendants on the trial of the third remaining defendant who is also charged with contributing to the death of the decedent?
"2. Given that the plaintiff has already received $450,000 in pro tanto settlements, is defendant Schering Corporation required to pay damages only if the jury verdict exceeds $450,000?
"3. Is either the defendant or the plaintiff entitled to introduce into evidence for the jury's consideration the fact that the plaintiff has already received $450,000 for the decedent's wrongful death?"

FACTS
Elma Tatum, as administrator of the estate of Dixie V. Tatum, deceased, filed a *1043 wrongful death case in the Circuit Court of Montgomery County, alleging that Mrs. Tatum died as the result of her physician's negligence in failing to follow directions for administering injectable gold in the treatment of Mrs. Tatum's arthritis. Tatum amended the complaint to include claims of negligence and violation of the Alabama Extended Manufacturer's Liability Doctrine against Schering Corporation and another manufacturer of the ethical drugs used to treat Mrs. Tatum. He alleged that these manufacturers placed on the market a drug that was unreasonably dangerous and that they failed to adequately warn Mrs. Tatum's physician of the dangers involved. Plaintiff Tatum reached a settlement with the physician in the amount of $400,000 and with one of the drug manufacturers in the amount of $50,000. Pro tanto releases were given to these defendants and they were dismissed as parties. This created diversity of citizenship between the plaintiff and the remaining defendant, and that remaining defendant, Schering Corporation, removed the case to the United States District Court for the Middle District of Alabama.
The certificate from the district court states that the phrasing of the questions is intended as a guide and is not meant to restrict our consideration of the impact of a pro tanto settlement with a tort-feasor in a wrongful death case on the subsequent trial of another alleged tort-feasor.
The certified questions have been briefed extensively by able counsel for both sides, and the Court has heard persuasive oral arguments in support of, and in opposition to, a change in our rule that there can be no apportionment of punitive damages, even when there are joint tort-feasors, regardless of the degree of their individual culpability.
Although highly persuasive arguments can be made that prior cases of this Court were incorrectly decided, this Court has resolutely refused to change the rule of law that punitive damages are not apportionable among joint tort-feasors. In fact, this Court reaffirmed the rule last term in the case of Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala. 1987).
There, this Court specifically asked the parties to brief the same issue presented by these certified questions, and in our opinion we wrote, as follows:
"One basic question is presented on this review:
"Should this Court change its longstanding rule that there can be no apportionment of damages among joint tortfeasors, especially in death cases where this Court has concluded that only punitive damages are recoverable?
"Based upon a review of the history of § 6-5-410 [Code 1975] and a review of cases from other jurisdictions, we could change the rule regarding apportionment of punitive damages in wrongful death cases and adopt the majority rule, but we decline to do so."
Black Belt, supra, at 1260.
The first Alabama case dealing with the apportionment issue was Bell v. Riley Bus Lines, 257 Ala. 120, 57 So.2d 612 (1952). That case was a wrongful death action. The plaintiff's decedent was killed when a truck and trailer collided with the bus in which he was riding. We find that case dispositive of the questions here presented, and we quote from it extensively:
"The appellant sued Riley Bus Lines; Riley Bus Lines, a corporation; Isaac Riley and Sarah Riley, doing business as Riley Bus Lines; and Herrington Motor Company and Truck Lines and Wallace Herrington doing business as Herrington Motor Company and Truck Lines, for wrongfully causing the death of her intestate, basing her right to sue on § 123, Title 7, Code of 1940, commonly referred to as `The Homicide Act.' [Now § 6-5-410.]
"... [the complaint contained this allegation:] `Plaintiff avers that the said Howard Bell was killed as a proximate result or consequence of the concurrent negligence of Riley Bus Lines, or Riley Bus Lines, a corporation, or Sarah Riley and Isaac Riley doing business as Riley Bus Lines, and Herrington Motor Company and Truck Lines, or Wallace Herrington, *1044 doing business as Herrington Motor Company and Truck Lines, or their respective agents who were then and there acting within the line and scope of their authority, in and about the management or operation of the said Bus and the said automobile truck and trailer.'
"* * *
"The trial was by jury duly demanded by the plaintiff and the jury returned a verdict in the following words and figures:
"`We the Jury return verdict in favor of Plaintiff and assess damages against Riley Bus Line $5,000.00 and Wallace Herrington $2,500.00.' Judgment was entered on said verdict and Isaac Riley, Saralee Riley and Riley Bus Lines, a partnership composed of Isaac Riley and Saralee Riley, seasonably made motion for a new trial on the grounds that said `verdict and judgment are contrary to the law of the case; said verdict and judgment are not sustained by the great preponderance of the evidence; said verdict and judgment are arbitrary and prejudicial; said verdict and judgment are contrary to law, in that the complaint claimed damages from Riley Bus Lines and Wallace Herrington for the death of plaintiff's intestate, allegedly caused by the concurring negligence of both said joint defendants, and the verdict and judgment were returned and entered in favor of plaintiff against both said defendants and was not in a lump sum against both defendants but apportioned the damages in the sum of $2500 against Wallace Herrington and in the sum of $5000 against Riley Bus Lines; said verdict being in words and figures as follows: "We the jury return verdict in favor of plaintiff, and assess damages against Riley Bus Lines $5000 Wallace Herrington $2500 /s/ Norman Beverly, foreman."' [Emphasis added.]
"The motion for new trial also contained many other grounds. The motion was granted by the court and new trial was ordered. Hence this appeal.

"It is strenuously insisted by the appellant and the appellee Wallace Herrington that the jury were authorized to apportion punitive damages between the defendants accordant to the degree of culpability in causing the death of plaintiff's intestate. As authority for their contention they cite decisions from other jurisdictions mostly dealing with common law actions against joint tort feasors, which were collated in Hall v. McClure, 112 Kan. 752, 212 P. 875, 30 A.L.R. 790 and in Thomson v. Catalina, 205 Cal. 402, 271 P. 198, 62 A.L.R. 239. [Emphasis added.]
"* * *
"It has long been settled in Alabama that damages recoverable in such actions are punitive of the person who wrongfully causes the death. Richmond & Danville R.R. Co. v. Freeman, 97 Ala. 289, 11 So. 800. It has also long been settled that the statute creates a single cause of action unknown to the common law and the personal representative is authorized to sue as an agent of legislative appointment for effecting the declared public policy of preventing homicides. Breed v. Atlanta B. & C.R. Co., 241 Ala. 640, 4 So.2d 315; Also it is settled that the suit under this statute may be prosecuted against joint tort feasors whose wrongful act or negligence proximately causes the death; and they may be sued jointly or separately, but there being but a single cause of action, one recovery and satisfaction is a bar to further prosecution of any other suit on that cause of action. McCoy v. L. & N.R.R. Co., 146 Ala. 333, 40 So. 106. Nevertheless, the personal representative may settle with one tort feasor and prosecute his action against another, provided he reserves the right in taking the release which releases only the person with whom the settlement is made. Steenhuis v. Holland, 217 Ala. 105, 115 So. 2. [Emphasis in original opinion.]
"* * *
"There is nothing in this statute that authorizes the jury to apportion the damages against tort feasors sued in this *1045 action. Nor does it recognize degrees of culpability and as applied if the wrongful act or negligence proximately caused the death, the plaintiff is entitled to `recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama.' The well settled trial practice in our courts has been to require a single verdict, fixing a lump sum regardless of the culpability of tort feasors. City of Birmingham v. Hawkins, 196 Ala. 127, 72 So. 25; Layman v. Hendrix, 1 Ala. 212; City of Tuscaloosa v. Fair, 232 Ala. 129, 167 So. 276; 64 C.J. p. 1084; Bull v. Albright, 254 Ala. 29, 47 So.2d 266.

"In the absence of express legislative authority we are not willing to depart from this well settled trial practice. Therefore the opinion prevails that the court did not err in setting aside the verdict and granting a new trial as to all defendants. [Emphasis added.]"
Id., 257 Ala. at 122-24, 57 So.2d at 613-15.
In Black Belt, this Court noted that it had the power to abrogate the longstanding rule of law in wrongful death cases, but that "it should, as a matter of public policy, leave any change of [the] interpretation to the legislature." 514 So.2d at 1263.
In answer to each of the questions, we opine that the damages recoverable in a wrongful death action are punitive in nature, as Question One correctly assumes, and that in a wrongful death action filed against joint tort-feasors, a plaintiff is entitled to a single recovery that will represent the total amount of punitive damages the jury may assess for the wrongful death. This total recovery assessed, in an amount determined by the jury as punishment for the homicide, cannot be apportioned among joint tort-feasors.
In this case, if the plaintiff proves to the jury that the total amount of the punitive damages that should be assessed against the joint tort-feasors exceeds the sum of $450,000, then the $450,000 that the plaintiff has received by way of pro tanto settlements would be a partial satisfaction of the total amount determined by the jury. On the other hand, if the jury determines that the total amount of the plaintiff's punitive damages for the homicide is an amount equal to or less than $450,000, then, in that event, the plaintiff is entitled to recover nothing from alleged joint tortfeasor Schering Corporation, because the plaintiff will have already had his recovery satisfied by the payment of the $450,000 pursuant to the pro tanto settlements.
In answer to your third question, we opine that a person injured by joint tort-feasors may accept partial satisfaction and release one or more pro tanto and proceed against the other; however, the tort-feasors not so released may plead the release as a bar to that amount paid by the released tortfeasor(s) or may place it in evidence to show payment for the injury up to the amount shown in the release. Steenhuis v. Holland, 217 Ala. 105, 115 So. 2 (1927); Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699 (Ala.1982).
In Bucyrus-Erie Co. v. Von Haden, this Court said:
"It is well settled that a person injured by joint tort-feasors may release one or more pro tanto and proceed against the others. The tort-feasors may plead the release as a bar to that amount paid by the released tort-feasor or may place it in evidence showing payment for the injury up to the amount shown in the release. Anderson v. Kemp, 279 Ala. 321, 184 So.2d 832 (1966). In lieu of allowing defendant to place the pro tanto settlements into evidence, the trial court properly informed the jury of the total amount of the settlements and instructed them to subtract that figure, $145,000, from the full amount of damages, if any sustained by plaintiff."
Under the doctrine of these cases, the remaining defendant would be entitled to plead the release as a bar to that amount paid by the released tort-feasors, or that defendant could place it in evidence to show payment for the injury up to the amount shown in the releases. Under the doctrine of Bucyrus-Erie, the Court, in lieu of allowing the defendant to place the pro tanto settlements into evidence, could *1046 instruct the jury on the total amount of the settlements, as was done in Bucyrus-Erie.
CERTIFIED QUESTIONS ANSWERED.
ALMON, SHORES, BEATTY, ADAMS and STEAGALL, JJ., concur.
TORBERT, C.J., concurs in part, and dissents in part.
JONES and HOUSTON, JJ., dissent.
TORBERT, Chief Justice (concurring in part and dissenting in part).
I agree with Justice Houston's dissent, except that if his view had prevailed, that is, if this Court had been persuaded to allow recovery of compensatory damages for wrongful death, I would not have applied that new holding to this case, but would have applied it only prospectively. I believe that a prospective only application would be necessary because two of the three defendants in this case have settled the claims against them based upon the rule that only punitive damages were recoverable. To change the rules in the middle of this litigation would unfairly place the burden of any award of compensatory damages solely on the shoulders of Schering Corporation, while still leaving that defendant liable for punitive damages.
Therefore, I concur with the majority opinion to the extent that it allows only a recovery of punitive damages in this case.
JONES, Justice (dissenting).
I respectfully dissent.
All three certified questions are grounded on the "given" proposition "that only punitive damages are recoverable in an Alabama wrongful death suit." It is the self-contradictory anomaly implicit within the second "given""that punitive damages are not apportionable among [joint tort-feasors] according to fault"that highlights the single inquiry before the Court. Undoubtedly prompted by this Court's decision in Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1987) (a case in which the "apportionment of damages" issue was not properly before this Court on return after a Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), remand), the federal district court, appropriately and wisely, has afforded this Court an opportunity to address, before trial, the issue whether, given the "degree of wrong" standard for measuring punitive damages, such damages are apportionable among joint tort-feasors according to the degree of wrong of each defendant.
This question (crying out for an affirmative response) is dramatized by the incongruity of the "nonapportionment" rule: On the one hand, the jury is instructed to measure punitive damages, if any, according to each defendant's degree of wrong; and, on the other hand, if it finds for the plaintiff, the jury is instructed to return a verdict against the defendants for a single amount of damages. The "nonapportionment" rule is based upon a "single recovery" conceptany amount of damages by way of settlement from one or more joint tort-feasors is credited against the subsequent recovery from one or more remaining joint tort-feasors.
Under the "apportionment" rule, punitive damages are assessed according to each joint tort-feasor's proportionate degree of wrong. Thus, under such a rule the amounts already paid by the released defendants would not be taken into account in assessing punitive damages against the trial defendant for its proportionate share of the total culpability contributing to the death of the plaintiff's intestate. The application of the "nonapportionment" rule means that the remaining trial defendant is entitled to credit for the $450,000 already paid. The application of the "apportionment" rule would mean that the plaintiff is entitled to the full amount of punitive damages, if any, awarded against the trial defendant without regard to the amount already paid by the released defendants. (Admittedly, a plaintiff is entitled to recover the total of his compensatory damages without apportionment among joint tort feasors according to fault, because the function of compensatory damages focuses on the plaintiff's loss. But the function of punitive damages focuses on the degree of the defendant's culpability; and the application *1047 of the "nonapportionment of damages among joint tort-feasors" rule defeats the very purpose of punitive damages.)
I conclude with this observation: The "apportionment/nonapportionment of punitive damages" dichotomy cannot be defined in terms of "pro-plaintiff" or "pro-defendant." If a plaintiff goes to trial against joint tort-feasorsone solvent and one insolventwhere the solvent defendant's culpability is 10% of the total fault and the insolvent defendant's culpability is 90%, the "nonapportionment" rule may favor the plaintiff. Under the facts of the instant case, however, the "nonapportionment" rule may favor (depending, of course, on the outcome of the trial) the remaining trial defendant by giving it credit for the sums already paid by the released defendants.
This Court should adopt the only rule that makes sensepunitive damages against joint tort-feasors should be apportionable according to each defendant's proportionate degree of culpability. See Black Belt Wood Co. v. Sessions, supra (Jones, J., concurring specially). Thus, the answer to the certified questions should be that the $450,000 already paid by the released defendants has no effect on the trial against the remaining defendant.
HOUSTON, Justice (dissenting).
I dissent.
I would not address the certified questions as the majority of this Court has. To me, the certified questions require us to reexamine the conflict between the purposes for awarding punitive damages and our rule of nonapportionment of damages among joint tort-feasors for an indivisible injury. Our previous decisions have ignored this conflict and answered the questions presented in a piecemeal fashion. These certified questions in a wrongful death context require me to address these problems head-on, and to reexamine the nature of damages that can be recovered under the Alabama Wrongful Death Statute (Sometimes called the "Homicide Statute"), § 6-5-410, Code 1975.
The majority, in effect, reposes in Steenhuis v. Holland, 217 Ala. 105, 115 So. 2 (1927), which allowed a pro tanto settlement in a wrongful death case, and responds to the first certified question as follows: The pro tanto releases of two defendants have an effect on the trial of the third remaining defendant who is charged with contributing to the death. By doing this, the majority ignores the fact that, due to the way we have interpreted our Wrongful Death Statute, the result in Steenhuis may be incorrect and inconsistent with other opinions of this Court and with the underlying public policy that those decisions were attempting to enforce, and the fact that it raises constitutional problems.
Schering Corporation contends that our wrongful death law has focused on the result (death) of a tort-feasor's wrongful act, omission, or negligence, rather than on the nature of the wrongful act, omission or negligence. In Robbins v. Forsburg, 288 Ala. 108, 110, 257 So.2d 353, 355 (1971), we held that in a wrongful death case Alabama law requires "a single verdict, fixing a lump sum regardless of the [individual] culpability of tortfeasors." A cause of action for wrongful death is one and indivisible. In General Motors Corp. v. Edwards, 482 So.2d 1176, 1190 (Ala.1985), we held that "death is certainly an indivisible injury." In Ex parte City of Huntsville, 456 So.2d 72, 74 (Ala.1984), overruled on other grounds, Diemert v. City of Mobile, 474 So.2d 663 (Ala.1985), we quoted from W. Prosser, The Law of Torts, § 52 at 315-16 (4th ed. 1971): "Certain results, by their very nature, are obviously incapable of any logical, reasonable, or practical division. Death is such a result...." Therefore, we have not allowed an apportionment of damages in wrongful death cases. Bell v. Riley Bus Lines, 257 Ala. 120, 57 So.2d 612 (1952).
Schering argues that if in wrongful death cases, damages are only punitive and punish for the single individual injury (death) and are not for each individual wrongful act or omission, or act of negligence that proximately caused such death, then any settlement by a personal representative with any tort-feasor satisfies the societal interest of punishing for that death *1048 and prohibits the personal representative from recovering from any other tort-feasors. What of Steenhuis v. Holland, supra, which, by the rule "do," permitted a personal representative to proceed against a tort-feasor after entering into a pro tanto settlement with another tort-feasor? And what effect would such a ruling have on our strong policy of encouraging settlement and compromise? Maddox v. Druid City Hospital Board, 357 So.2d 974 (Ala. 1978); Steenhuis v. Holland, supra.

I. APPORTIONMENT OF DAMAGES
If a plaintiff is damaged as a result of the wrongful act, omission, or negligence of another, the plaintiff is entitled to full compensation for all damages proximately caused by such wrongful act, omission, or negligence. Beloit Corp. v. Harrell, 339 So.2d 992, 998 (Ala.1976); 1 Sutherland, Damages §§ 1 & 2 (1916). If a plaintiff is damaged as a result of the combined or concurring wrongful acts, omissions, or negligence of others, the plaintiff is entitled to full compensation for all damages proximately caused by such wrongful acts, omissions, or negligence. Layman v. Hendrix, 1 Ala. 212, 214 (1840); Apportionment of Punitive Damages 38 Val.L.Rev. 71, 71-72 (1952). The interest of the uncompensated victim must always be kept foremost in mind in dealing with compensatory damages. Layman v. Hendrix, supra. The principle of joint and several liability allows the victim to shift liability among multiple tort-feasors and gives the victim the maximum assurance that he or she will receive full compensation for all damages sustained. Layman v. Hendrix, supra. There are strong policy considerations and almost universal application of the joint and several liability doctrine in the assessment of compensatory damages; therefore, there is and should be no apportionment of compensatory damages among joint tort-feasors. T. Christensen, The Apportionment of Punitive Damages Among Joint Tortfeasors, 25 Ariz.L.Rev. 579 (1983).
What of punitive damages? In Alabama we have held that "the plaintiff is without legal rights to them [punitive damages], as that right attaches to actual damages suffered. Comer v. Age-Herald Pub. Co., 151 Ala. 613, 44 So. 673, 13 L.R.A. (M.S.) 525 (1907). Such damages [punitive] may be even forbidden, or affirmatively withheld, by legislative enactment, so far as impinging rights of property are concerned." Dowling, Adm'r v. Garner, 195 Ala. 493, 496, 70 So. 150, 151-52 (1915), quoting Louisville & N.R.R. v. Street, 164 Ala. 155, 51 So. 306, 20 Ann.Cas. 877 (1909) (emphasis supplied). "Most courts no longer give deference to a plaintiff's claim of a right to punitive damages." T. Christensen, The Apportionment of Punitive Damages Among Joint Tortfeasors, 25 Ariz.L.Rev., 579, 585 (1983).
Since punitive damages are not to compensate a victim for loss but to punish and deter, the state alone is considered the true party plaintiff, and in seeking punitive damages, a plaintiff is an agent of the state and not a victim. Note, Apportionment of Punitive Damages, 38 Va.L.Rev. 71, 73 (1952). Such damages are awarded as a matter of discretion by the trier of fact. This Court has held that trial and appellate courts are forbidden to review and revise a punitive damages award under the Homicide Statute "`on the sole ground of the inadequacy of the sum assessed, that could only be, and was, we must assume, so assessed, as the jury's idea of the punishment due the wrongdoer'" (emphasis supplied). Dowling, Adm'r v. Garner, supra, 195 Ala. at 487, 70 So. at 152. Whether we will adhere to this precedent if it is again presented to us is not now before us, but this view is consistent with the criminal law principle that prohibits an increase in a sentence in a criminal case by a trial or appellant court after the sentence is imposed. Rice v. Simpson, 274 F.Supp. 116 (1967), affirmed, 396 F.2d 499 (5th Cir. 1968), affirmed, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). Because the purpose of punitive damages is not to compensate the plaintiff, in considering punitive damages there is no "amount" to which an uncompensated victim is entitled; and, therefore, there is no need for giving anyone maximum assurance that a certain *1049 amount will be recovered. When considering punitive damages, the defendant's right to fair punishment must be paramount to giving the plaintiff maximum assurance that he or she will recover the full amount of punitive damages from all tort-feasors, for the plaintiff has no right to such damages and they are not awarded to compensate the plaintiff. Joint and several liability, with its emphasis on the interests of the uncompensated victim, is in conflict with the purposes of punitive damages, for in Alabama and most states there is no victim who is entitled to compensation. A recovery of punitive damages by execution from a defendant who does not deserve the penalty or who deserves a lesser penalty based upon his or her fault, while others who are truly culpable and deserve the penalty go unpunished raises the spectre of unconstitutionality, Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823 (1986), and is not consistent with the policy underlying punitive damages. Roberson v. Amnions, 477 So.2d 957 (Ala.1985); Bowles v. Lowery, 5 Ala. App. 555, 59 So. 696 (1912).
Alabama does not permit contribution among joint tort-feasors, Crigler v. Salac, 438 So.2d 1375 (Ala.1983), which is permitted either by statute or judicial decision in most states. T. Christensen, The Apportionment of Punitive Damages Among Joint Tortfeasors, supra, at 585-86 (nn. 75 and 76). Therefore, in Alabama, the punishment of defendants, when there are more than one, remains where the plaintiff imposes it.
Merryweather v. Nixon, 101 Eng.Rep. 1337 (K.R.1799), is the progenitor of the joint and several liability doctrine as to both compensatory and punitive damages. The basis for the preferential treatment of the plaintiff insofar as punitive damages are concerned stems from the traditional unwillingness of courts to entertain or adjust the claims of convicted intentional tort-feasors. Morris, Punitive Damages in Tort Cases, 44 Harv.L.Rev. 1173, 1192-93 (1931). The spectre of unconstitutionality Richmond & D.R.R. v. Freeman, 97 Ala. 289, 297, 11 So. 800 (1892) and Aetna Life Insurance Co. v. Lavoie, supra, should overrule outmoded pieties of equity. Apportionment of punitive damages received strong support in Justice Jones's opinion concurring in the result in Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1987). In regard to our nonapportionment of punitive damages, he wrote: "The threshold test of validity of any law ought to be two-fold: 1) It ought to make sense; and 2) it ought to be honest." 514 So.2d at 1267. Justice Jones concluded that applying the joint and several liability doctrine, which prohibits apportionment, to punitive damages meets neither part of this test. I agree. In permitting the apportionment of punitive damages, this Court would not be "the first by whom the new are tried,"[1] for at least 16 states have approved the apportionment of punitive damages. T. Christensen, The Apportionment of Punitive Damages Among Joint Tortfeasors, p. 579 (note 10).
If I could speak for the Court, I would hold that in all cases in which the trial commences after the release of this opinion, the jury should be instructed that if it finds that two or more defendants are liable for punitive damages, under the instructions given to it by the court as to when punitive damages are appropriate, it shall apportion the damages among the several defendants in accordance with each defendant's degree of culpability.

II. DAMAGES IN WRONGFUL DEATH CASES
"Given that only punitive damages are recoverable in an Alabama wrongful death suit" (the predicate for the certified questions), I now address the peculiar interpretation that this Court has given our wrongful death statute (§ 6-5-410, Code of Alabama 1975, and its predecessors). Since there has been no "compensation" for death, but only punishment, are we to allow *1050 apportionment of all damages in wrongful death cases, but allow apportionment of only those damages in excess of those that compensate in cases involving personal injury, fraud, etc.?
Certainly, there is a "victim" in a case involving death, just as there is in a personal injury case. Certainly, there is a loss that can be partially compensated for in a case involving death, just as there is in a personal injury case. In a case involving death, there is an interest of an uncompensated victim, just as there is in a personal injury case, and this interest should be kept foremost in mind in dealing with the compensable part of the loss and should be given maximum assurance that full compensation will be received for that compensable part of the loss.
To allow apportionment of all damages in a wrongful death case, then, would give primacy to the defendant's right to fair punishment rather than to an uncompensated victim's right to maximum assurance that he or she will receive full compensation for all damages sustained.
This is not the first time that the Court's peculiar interpretation of the damages aspect of our wrongful death statute has called into question its application of principles of basic fairness and suggested constitutional defects. See Carter v. City of Birmingham, 444 So.2d 373 (Ala.1983), cert. denied, 467 U.S. 1211, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984), in which the Court held that 42 U.S.C. § 1983 actions cannot be maintained in Alabama against municipalities for wrongful death, even though § 1983 actions could be maintained if the same act caused only personal injuries, because municipalities are immune from punitive damages under § 1983. Justice Jones, in a strong dissent to this portion of the opinion, (pp. 379-80) included this: "In my opinion, the Supremacy Clause of the United States Constitution precludes our rejection of the § 1983 claim against the City." Therefore, before I address the issue of apportionment of damages in wrongful death cases, I must review the damages aspect of wrongful death cases.
Other than strong judicial precedent, there is nothing embodied or expressed in § 6-5-410, Code 1975, that makes the damages recoverable for wrongful death "only punitive."
"[A]nd recover such damages as the jury may assess ..., for the wrongful act, omission or negligence ... whereby the death... was caused, provided the [decedent] could have commenced an action for such wrongful act, omission or negligence if it had not caused death." § 6-5-410. Clearly, the Legislature did not use such terms as "vindictive damages" (§ 6-6-148, Code 1975), which was a phrase used in statutes enacted by the Legislature prior to 1860, the time of the enactment of the first wrongful death statute that the Court interpreted as permitting only punitive damages. See Black Belt Wood Co. v. Sessions, supra, at 1260-61. The present statute did not use the words "exemplary damages", which were used in what is now § 6-5-71, Code 1975, Act No. 191, 1909 Ala. Acts, and in Code 1923, §§ 5674, 5675; and Code 1940, T. 7, §§ 121, 122. The Legislature did not use the term "exemplary or punitive damages," which it used in what is now § 6-6-296, Code 1975, which phrase was also used when this section appeared as § 7470, Code 1923, and T. 7, § 955, Code 1940. It is obvious that the Legislature knew how to enact legislation authorizing punitive damages. The words of the present statute do not indicate that only punitive damages are recoverable.
"[S]uch damages":
"Such," as an adjective, is defined as "of a kind or character about to be indicated, suggested, or exemplified" and "having a quality to a degree to be indicated." Webster's Third New International Dictionary, Unabridged (1971) (emphasis supplied).
The only things "indicated, suggested, or exemplified" in the remainder of the statute as to the kind, character, or quality of "such" are "as the jury may assess ... for the wrongful act, omission or negligence... whereby the death ... was caused" and "provided the [decedent] could have commenced an action for such wrongful *1051 act, omission or negligence if it had not caused death."
"Such" also means "having a quality already or just specifiedused to avoid repetition of a descriptive term." Webster's, supra. No descriptive term precedes "such" in the statute. The statute begins with the clause "A personal representative may commence an action and recover such damages...." Therefore, the essence of "such" must be determined from phrases that follow it.
The word "damages" does not import "only punitive damages." "Damages" is defined as pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property or rights, through the unlawful act or omission or negligence of another. Richmond & D.R.R. v. Freeman, 97 Ala. 289, 295, 11 So. 800 (1892); Rayford v. Rayford, 456 So.2d 833, 834 (Ala. Civ.App.1984); Black's Law Dictionary (Rev. 4th ed. 1968); C. Gamble and D. Corley, Alabama Law of Damages, p. 1 (1982).
"May assess":
"May" is defined as "to have the power: be able," "have the ability or competence to," "have permission to," "have liberty to," and "be in some degree likely to." Webster's, supra. Black's, supra, defines "may" as: "An auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency."
"Assess" is defined as "to determine the rate of" and "to determine the amount of or impose." Webster's, supra. Black's, supra, defines "assess" as: "To ascertain; fix the value of. To fix the amount of damages or the value of the thing to be ascertained. To impose a pecuniary payment upon persons or property."
The mere fact that "as the jury may assess" follows "such damages" does not make "such damages" only punitive any more than such words would make them only compensatory.
Justice Maddox, in a special concurrence in Maples v. Chinese Palace, Inc., 389 So. 2d 120, 125, (Ala.1980), wrote:
"I think that the words `such damages as the jury may assess' are broad enough to include the assessment of compensatory damages when injury proximately results from the illegal sale [of liquor to a minor], and punitive damages when death proximately results from the illegal sale."
This was in reference to § 6-5-70 ("Furnishing liquor to minors"), Code 1975, known as the Civil Damage Act, which is as follows:
"Either parent of a minor, guardian or a person standing in loco parentis to the minor having neither father nor mother shall have a right of action against any person who unlawfully sells or furnishes spirituous liquors to such minor and may recover such damages as the jury may assess...." (Emphasis supplied.)
If the language in § 6-5-70 is broad enough to be either compensatory or punitive, what makes it "only punitive" in § 6-5-410?[2]
In 1956, 69 years after this Court first interpreted what is now § 6-5-410 as allowing only punitive damages, Alabama Great S.R.R. v. Burgess, 116 Ala. 509, 22 So. 913 (1897), the Alabama Legislature enacted what is now § 6-5-411, Code 1975, for "injuries to decedent's property resulting from wrongful act, etc., causing death." The pertinent part of the statute for this analysis is: "The personal representative of a deceased person may ... recover such damages as the jury may assess for injuries or damages to the property of the decedent resulting from the same wrongful act, omission or negligence which caused the death of the decedent, provided the decedent could have commenced such action if the wrongful act, *1052 omission or negligence causing the property damage had not also caused his death." (Emphasis supplied.) Compensatory damages are recoverable under this Code section. See Motors Insurance Corp. v. Loftin, 277 Ala. 331, 170 So.2d 281 (1964); Standard Accident Insurance Co. v. Whitset, 270 Ala. 334, 118 So.2d 922 (1960); Chappell v. Boykin, 41 Ala.App. 137, 143, 127 So.2d 636 (1960), cert. denied, 271 Ala. 697, 127 So.2d 641 (1961).
Certainly, this is strong support for Justice Maddox's statement in his special concurrence in Maples v. Chinese Palace, Inc., supra, that the phrase "such damages as a jury may assess" can be interpreted, and has been interpreted by this Court, to mean either compensatory damages, or punitive damages, or both.
Are the damages referred to in § 6-5-411 compensatory because the statute contains the words "for injury or damages to the property ... resulting from the same wrongful act, omission or negligence which caused the death," whereas § 6-5-410 contains the words "for the wrongful act, omission or negligence ... whereby the death ... was caused"? If so, it is a distinction without a difference; death resulting from a wrongful act, omission, or negligence is not different from "for the wrongful act, omission, or negligence... whereby the death ... was caused."
The phrase "wrongful act, omission, or negligence" appears in § 6-5-411, and this Court has held that the damages allowed by that statute are compensatory. Therefore, the phrase "wrongful act, omission, or negligence" in § 6-5-410 does not indicate, suggest, or exemplify that the phrase "such damages," which precedes it, implies only punitive damages.
The phrase "provided the [decedent] could have commenced an action for such wrongful act, omission or negligence if it had not caused death" does not indicate, suggest, or exemplify that the phrase "such damages," which precedes it in § 6-5-410, are only punitive damages. In § 6-5-411, "such damages" is followed by "provided the decedent could have commenced such action if the wrongful act, omission or negligence causing the property damage had not also caused his death." We have held that "such damages" in § 6-5-411 are compensatory.
Lord Campbell's Act, 9 & 10 Vict. Ch. 93 (1846), and the wrongful death statutes of at least 44 states in addition to Alabama use the phrase "wrongful act."[3] Compensatory damages are recoverable for death by wrongful act in each of those 44 states.[4] *1053 Lord Campbell's Act, supra, and the wrongful death statutes of at least 40 states in addition to Alabama use the word "negligence" or "neglect."[5] Compensatory damages are recoverable for death by negligence or neglect in each of those 40 states.[6] The wrongful death statutes of 7 *1054 states in addition to Alabama use the word "omission".[7] (Lord Campbell's Act and the statutes of at least 27 states use the word "default" instead of "omission."[8]) Compensatory damages are recoverable in each of those 7 states in which "omission" is a part of the statute and in those 27 states in which "default" is a part of the statute.[9]
*1055 In holding that only punitive damages could be recovered in a wrongful death action, this Court rewrote the statute it purported to construe.
Having found nothing in the words of § 6-5-410 to limit the damages recoverable under this statute to "only punitive" damages, and having examined other states' interpretations of similar wrongful death statutes as permitting the recovery of compensatory damages, I now examine the judicial history of the Alabama Wrongful Death Statute in an attempt to find out how this Court became like Johnny's mother, who while watching the parade exclaimed, "Look, everyone is out of step except my Johnny."
To put this in perspective, it is necessary to look first at the law of England. In Baker v. Bolton, 1 Campbell 493, 170 Eng. Reprint 1033 (1803), Lord Ellenborough in dictum in a nisi prius case, tried in a local court before a single judge and not en banc in the superior court at Westminster, wrote: "[I]n a civil court, the death of a human being could not be complained of as an injury." There followed a long and stately train of decisions declaring that the common law denied a right of recovery for the death of a human being killed by the negligence or wrongful act of another. See Mobile Life Ins. Co. v. Brame, 95 U.S. (5 Otto) 754, 24 L.Ed. 580 (1877); Kennedy v. Davis, 171 Ala. 609, 55 So. 104 (1911), as examples of these. Some states that had allowed compensation in death cases prior to Baker v. Bolton, supra (see Foster's Case, 1 Court of Assistants 54 (Mass.1674); Cross v. Guthery, 2 Root 90 (Conn.1794)), ignored their own precedent and followed the dictum in Baker v. Bolton, supra, (see, Carey v. Berkshire R.R., 55 Mass. (1 Cush.) 475 (1848); Connecticut Mut. Life Ins. Co. v. New York & N.H.R.R., 25 Conn. 265 (1856).)
The rule in Baker v. Bolton, supra, was soundly criticized by some courts. (see Plummer v. Webb, 1 Ware 75 (69), F. Case No. 11234 (D.C.Me.1825), and Van Amburg v. Vicksburg, S. & R.R., 37 La.Ann. 650 (1885)).
There was no basis in precedent for the dictum in Baker v. Bolton, supra. In Anglo-Saxon England, homicide was regarded as a civil offense. Damages for killing a person, in the form of "weregild" (man'sprice), were paid by the killer to the deceased's relatives. The amount was not regulated originally nor fixed at any certain rate, but left to the discretion of the deceased's relatives, limited only by their inability to refuse a reasonable amount. 1 Sullivan, Lectures on the English Law 117 (1st American ed. 1805).
The payment was compensatory.
*1056 "If a man killed another, the slayer was to compensate his death by the payment of a certain sum, greater or less, according to the circumstances of the case." Crabb, English Law 35 (1829) emphasis added).
The amount of the payment evolved into an established scale based upon the social rank of the decedent, and no distinction was made between intentional acts done with deliberate malice, acts committed in the heat of passion, or mere inadvertence, Crabb, supra; 1 Pollack & Maitland, The History of English Law, 46-48 (2d ed. 1923); these facts made that system the exact opposite of the interpretation given by this Court to § 6-5-410, which "grades the quantum of the punishment upon the degree of culpability of the derelict person." Randle v. Birmingham Light & Power Co., 169 Ala. 314, 323, 53 So. 918, 921 (1910).
By the late 13th Century, all homicides in England, even most of those that were accidental, had become criminal offenses. Hay, Death as a Civil Cause of Action in Massachusetts, 7 Harv.L.Rev. 170, 171 (1893).
An involuntary or accidental homicide (homicide per infortunium) was not a felony, and the killer was not put to death; however, as in a felony, the killer's property was forfeited to the Crown. As long as the killer's property belonged to the Crown, it was useless for the decedent's relatives to attempt to obtain it. Hay, supra, p. 172. Therefore, to say that there was no cause of action for wrongful death at common law is not entirely correct.
Until 1819, when abolished by statute, there existed a quasi-civil remedy for the benefit of the heir or widow of the deceased in a homicide that was felonious. This was the right of "appeal." The heir or widow could release his or her right to have the felon put to death, just as a king could grant a pardon. In some cases this had great pecuniary value. Hay, Death as a Civil Cause of Action in Massachusetts, 7 Harv.L.Rev. 170, 173 (1893).
Having found nothing in precedent to support this favored dictum ("in a civil court, the death of a human being could not be complained of as an injury," Baker v. Bolton,) the courts resorted to "reason."
During the 18th Century, homicide per infortunium disappeared.
"Blackstone also notices this change, and his editor, Edward Christian, Esq., in 1795 appended the following note: `When homicide does not amount to murder or manslaughter, it is now the universal practice to direct an acquittal.' That was the end of homicide per infortunium.
"The idea that death was always a criminal matter, however, had more vitality. It had the force of a moral idea. It expressed the sacredness of human life. And it continued to make itself felt."
Hay, Death as a Civil Cause of Action in Massachusetts, p. 173 (emphasis supplied).
This was the mind set that replaced reason as a justification for the common law's not allowing the death of a human being to be complained of as an injury in a civil court. This mind set became a guide to some courts in interpreting statutes that attempted to alleviate the harshness of what Lord Ellenborough said was the common law. Justice Somerville, in King v. Henkie, 80 Ala. 505, 507 (1886), overruled on other grounds, Buchanan v. Merger Enterprises, Inc., 463 So.2d 121 (Ala. 1984), wrote: "The reason for the rule was said by Baron Parke, in a case arising before him under the English statute, to be, that in the eye of the common law `the value of life was so great as to be incapable of being estimated by money.'" Justice Somerville further noted that "[t]he rule probably, however, rests on a broader basis." Needing no broader basis, the Supreme Court of Michigan in Hyatt v. Adams, 16 Mich. 180, 192 (1867), wrote, "[T]o the cultivated and enlightened mind, looking at human life in the light of Christian religion as sacred, the idea of compensating its loss in money is revolting." (Emphasis supplied.)
A history of the Alabama wrongful death statutes appears in Central of Georgia Ry. *1057 v. Ellison, 199 Ala. 571, 579-80, 75 So. 159, 163 (1916):
"Statutes somewhat similar to this section of the Code were provided for by sections 1938-1941, both inclusive, of the Code of 1852, though the damages then were compensatory and limited, not to exceed three years' income of the deceased, and in no case to exceed $3,000; the damages recovered were for the benefit of the widow, if one, if not, for the children, and if no widow or children, for the next of kin. The act of February 21, 1860 (Acts 1859-60, p. 42), expressly repealed sections 1938 and 1939, and substituted therefor the statute making the damages punitive, such `as the jury deem just,' and making the damages distributed as personal property of the intestate, and making it exempt from the payment of debts. This last statute, by oversight, it is said, was omitted from the Code of 1867 entirely, and sections 1938 and 1939 were retained and remained the law up to February 5, 1872 (Acts 1871-72, p. 83) when the Legislature re-enacted the homicide statute, which was in all material respects identical with the former act, and was codified in the Code of 1876 as section 2641, and omitting sections 1938 and 1939 of the Code of 1852, which were, respectively, numbered 2297 and 2298 of the Code of 1867, thus repealing said sections. This statute next appeared as section 2589 of the Code of 1886, which combines sections 2641, 2642, and 2643 of the Code of 1876, which sections were, respectively, 2299 and 2300 of the Code of 1867 and sections 1940 and 1941 of the Code of 1852; and section 2589 of the Code of 1886 is substantially brought down in the Code of 1896, and appears as section 27 thereof."
In Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1260 (Ala.1987), this Court stated:
"As can easily be seen, the first act provided for only compensatory damages, and placed a `cap' on the amount of damages that could be awarded.
"In February 1860, the legislature amended this act. Pamphlet Acts 1859-60, p. 42. The pertinent language as far as damages were concerned became `such sum as the jury deem just.' There are no legislative reports that indicate the purpose of the change, and, consequently, we do not know what debate, if any, was involved in this change. There is no express mention made whether the damages were compensatory or punitive and, arguably, the statute could be construed to mean that the legislature merely removed the limitation on damages contained in the original act."
Act No. 62, Acts of Alabama 1871-72, p. 83, provided:
"AN ACT
"To prevent homicides.
"Section 1. Be it enacted by the General Assembly of Alabama, That when the death of a person is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action against the latter at any time within two years thereafter, if the former could have maintained an action against the latter for the same act or omission, had it failed to produce death, and may recover such sum as the jury deem just, and the amount so recovered shall be distributed as personal property of an intestate is now distributed; and shall not be subject to the payment of the debts of the deceased.
"Sec. 2. Be it further enacted, That the right of action hereby given shall survive against the personal representative of the person unlawfully causing the death aforesaid.
"Sec. 3. Be it further enacted, That all laws and parts of laws which may contravene the provisions of this act, be, and the same are hereby repealed.
"Approved, February 5, 1872."
Before this was judicially interpreted, it was codified in the Code of Alabama of 1876, which was approved on February 2, 1877. The Code section was as follows:
"§ 2641. Action for wrongful act causing death: damages distributed.
"When the death of a person is caused by the wrongful act or omission of another, *1058 the personal representative of the former may maintain an action against the latter at any time within two years thereafter, if the former could have maintained an action against the latter for the same act or omission, had it failed to produce death, and may recover such sum as the jury deem just, and the amount so recovered shall be distributed as personal property of an intestate is now distributed; and shall not be subject to the payment of the debts of the deceased; and such right of action shall survive against the personal representative of the person unlawfully causing the death aforesaid."
As shown above, the title of Act No. 62, Acts of Alabama 1871-72, was "AN ACT To prevent homicides." Prior to any judicial interpretation of that act, it was reenacted as § 2641, Code of Alabama 1876 (approved Feb. 2, 1877), and "To prevent homicides" was deleted from the title and "action for wrongful act causing death; damages distributed" was substituted therefor.
Even so, the title "To prevent homicides" does not imply that damages must be punitive only. "The term `homicide' is neutral; while it describes the act [the killing of one human being by the act, procurement, or omission of another], it pronounces no judgment on its moral or legal quality." Black's Law Dictionary, 5th ed. (1979). The word "homicide" does not imply that the killing was done by wrongful act or omission, yet the act purported to impose liability only if the death was proximately caused by the defendant's wrongful act or omission.
In Savannah & Memphis R.R. v. Shearer, 58 Ala. 672 (1877), the Court first interpreted the act, which had been recodified in the Code of 1876. In that case, the trial court had refused to give the following charge:
"4 The measure of damages in this case, is what the jury may find was the reasonable pecuniary loss occasioned by the death of deceased, and the law does not allow them to find any damage for wounded feeling or solace of mind of different members of the family, and if there was no pecuniary loss to the family by his death, then none should be found, and the verdict should be for defendant."
Justice Stone wrote as follows, at 680:
"Charge four fixes an erroneous measure of damages, and was rightly refused on that account, although in other respects it may have asserted correct legal principles. Lacerated feelings of surviving relations, and mere capacity of deceased to make money if permitted to live, do not constitute the measure of recovery under the act of Feb. 5, 1872. Prevention of homicide is the purpose of the statute, and this it proposes to accomplish by such pecuniary mulct as the jury `deem just.' The damages are punitive, and they are none the less so, in consequence of the direction the statute gives to the damages when recovered. They are assessed against the railroad `to prevent homicides."' (Emphasis supplied.)
The Court also held that the following charges were rightly refused:
"5. This is an action to recover money damage for pecuniary loss, and unless the death of deceased caused pecuniary loss, they can not find for plaintiff.
"6. In estimating damage, the jury will consider the age, health and occupation of deceased, and the comfort and support afforded to his family, and confine themselves to the actual and such other damage as would afford the family of deceased the same support they would have obtained from his labor during the time he would probably have lived; that in such cases the law looks only to such damage as can be reduced to a pecuniary standard, and they should only find such pecuniary damage as they deem just."
In South & North Alabama R.R. v. Sullivan, 59 Ala. 272 (1877), the Court relied on Savannah & M.R.R. v. Shearer, supra, decided that same year, in holding that the statute had a "wider aim and scope" than that of providing "a mere solatium to the wounded feelings of surviving relatives, nor the compensation of the [lost] earnings of the slain." This wider aim and scope *1059 was to punish the person or corporation by which the wrong was done and "give greater security to human life." The mere fact that "`[t]he damages, `tis true, go to the estate of the party slain, and, in effect, are compensatory ... does not change the great purpose of the statute"prevent homicides."'" 59 Ala. at 278-79.
Neither in Shearer nor in Sullivan did the Court analyze the words of the act itself.
However, the Court has tenaciously maintained the mind set that damages for wrongful death are only punitive, with Shearer and Sullivan as the foundation stones.
The act was substantially amended in the Code of 1886 (as can be seen in the following quotation, wherein all language that was changed has been capitalized) to become what is now § 6-5-410, which we have analyzed. There was no title "To prevent homicides" given to the substantially changed statute:
"ACTION FOR WRONGFUL ACT, OMISSION, OR NEGLIGENCE CAUSING DEATH. A PERSONAL REPRESENTATIVE MAY MAINTAIN AN ACTION, AND RECOVER SUCH DAMAGES AS THE JURY MAY ASSESS, FOR THE WRONGFUL ACT, OMISSION, OR NEGLIGENCE OF ANY PERSON OR PERSONS, OR CORPORATION, HIS OR THEIR SERVANTS OR AGENTS, WHEREBY THE DEATH OF HIS TESTATOR OR INTESTATE WAS CAUSED, IF THE TESTATOR OR INTESTATE could have maintained AN ACTION FOR SUCH WRONGFUL ACT, OMISSION, OR NEGLIGENCE, IF IT HAD NOT CAUSED DEATH; SUCH ACTION SHALL NOT ABATE BY THE DEATH OF THE DEFENDANT, BUT MAY BE REVIVED AGAINST HIS PERSONAL REPRESENTATIVE; AND MAY BE MAINTAINED, THOUGH THERE HAS NOT BEEN PROSECUTION, OR CONVICTION, OR ACQUITTAL OF THE DEFENDANT FOR SUCH WRONGFUL ACT, OR OMISSION, OR NEGLIGENCE; AND THE DAMAGES RECOVERED ARE NOT SUBJECT TO THE PAYMENT OF THE DEBTS OR LIABILITIES OF THE TESTATOR OR INTESTATE, BUT MUST BE DISTRIBUTED ACCORDING TO THE STATUTE OF DISTRIBUTIONS. SUCH ACTION MUST BE BROUGHT WITHIN TWO YEARS FROM AND AFTER THE DEATH OF THE TESTATOR OR INTESTATE."
Even though it is evident that the statute was materially changed, the Court in Richmond & D.R.R. v. Freeman, 97 Ala. 289, 11 So. 800 (1892) held that the change did not affect the measure of damages recoverable under the statute:
"Such is the construction given by this court to the act `to prevent homicide,' and as thus construed, it is manifest that the charge set out above is a sound exposition of the elements and measure of damages recoverable under the act unless there has been such modification of the statute in its recent codification as necessitates a different interpretation, or unless the act as thus construed is violative of the organic law, as counsel insist.
"Has the statute been changed in the respect under consideration since the decision in the Shearer and Sullivan cases? We think not. It has not in the present Code the title which it bore as an original enactment, `to prevent homicide.' But in the codification of statutes it is usual to omit their titles, and such omission[s] have never been supposed to alter their meaning. Moreover, this title was omitted from the Code of 1876, and the statute without it and considered only as a section of codified laws with an index head line was, as we have seen, given the same interpretation as had been put upon it when its purpose was blazoned in its caption. E.T. Va. & Ga. R.R. Co. v. King, [81 Ala. 177, 2 So. 152 (1886)]. And if the title served in this first instance to fix the intent of the law makers it is a fair presumption that this intent follows the statute in all subsequent codifications so long as the words employed by the legislature to effectuate that intent are not materially changed.

*1060 "The original act and as codified in 1876 provided that the personal representative of one whose death is caused by the wrongful act, etc., of another might `recover such sum as the jury deem just.' In the present Code the provision is for the recovery of `such damages as the jury may assess;' and this is the only modification which the act of 1872 has undergone at all. In our opinion the change is purely a verbal one, and in no sense material. The `sum' referred to in the original act and in the Code of 1876 was nothing more or less than `damages' as that word is used in the Code of 1886, (§ 2589), and the right to recover such sum as the jury deem just is no more, or less, than the right to recover such damages (sum) as the jury `may assess.' Indeed, in Sullivan's case, these expressions are used inter-changeably; the `sum' recoverable is there denominated and treated throughout as `damages' and the process by which the jury arrives at the amount of such sum is called `the assessment of damages;' and it was probably at the suggestion afforded by this case that the codifiers of 1886 changed the phraseology of the statute in these respects by inserting the more technical equivalent for the phrase `such sum as the jury deem just.' All sums recoverable for a wrongful act whether as punishment or compensation are `damages' in a legal sense, and whatever sum the jury `deem just' is returned as their verdict, and the sum so returned constitutes the damages assessed by them.

"The objection taken on constitutional grounds to the statute as it has been construed by this court seemed to us to be without merit. It is as clearly within legislative competency, of course, to punish negligence as it is to punish wantonness, willfulness or intentional wrong doing. It is not controverted at all that the common-law doctrine by which the imposition of punishment through a recovery at the suit of an individual of exemplary damages for wanton, willful or intentional misconduct is allowed, is well within organic limitations; and we conceive no basis for the distinction between the power to punish in this way for negligence and such power in respect of wantonness and the like when brought to the touch of constitutional guarantee intended to secure to the citizen certain rights as to the proceedings necessary to his arrest, arraignment, conviction and punishment for a violation of criminal law.

"The act of 1872 having been, without modification in any material sense, twice reenacted since the judicial construction we have been considering was put upon itin the Code 1876 and again in the Code 1886and being with that construction a constitutional exercise of the legislative power, it is now to be considered as if the terms and provisions, which have been evolved out of it and declared in concrete form by judicial interpretation, were expressly embodied in its letter. This, we think, should close the door to the overruling of the cases which put that construction on it, and to the adoption of a different one. This is the consideration which mainly moves the writer to a reaffirmation of the doctrinedeclared in the cases of Shearer, Sullivan and King, supra; the question, in his opinion, is no longer an open one. If it were, he should be much inclined to the view so ably urged by counsel, that the statute was primarily intended to afford compensation to the next of kin of a person coming to his death through the wrong of another, and to allow the imposition of punitive damages only in those cases where they would have been recoverable had the injury fallen short of death. He is disposed to think that a too far reaching influence was accorded to the title of the act; and if this case were here upon first impression, he would be strongly inclined to rule that the legislative intent was to prevent homicides by giving an action for fatal injuries as to which no right of action existed before where the next of kin of the slain were in fact losers by his death, the recovery to be tolled by their loss unless the circumstances of the wrongful act *1061 warranted the imposition of additional damages as a punishment under well established common-law principles. It is manifest that this construction would conserve the expressed legislative purpose, `to prevent homicides,' since it attached a new and previously non-existing liability to all wrongful acts producing death, would be more in harmony with general legal theories and precedents, and give [what] the writer conceives to be, a more reasonable field for the operation of the limitation of the right of action to cases in which the deceased might have recovered had the injury not been fatal. It would seem too, that this view should find some support in the provision giving direction to the sum recovered; and certainly it is strongly supported by that clause of the statute which provides that `the action shall not abate by the death of the defendant but may be revived against his personal representatives,' since in such case, there could be no punishment of the wrong doer but only of wholly innocent successors to his estate, and the whole policy of our laws, as of every civilized system of jurisprudence, is utterly at war with the idea of vicarious punishment, while the policy of enforcing compensation for wrongs done out of the estate of a deceased wrong doer is not opposed to any abstract notion of justice or to the practices of any theory of government. But be all that as it may, the legislature had the power to enact a law such as this one is with the construction this court has given it. They have in effect done so here by the re-enactment of this statute after its construction; and it now only remains for the courts to enforce it as thus constructed and re-enacted."
97 Ala. at 294-97, 11 So. at 801-03 (emphasis supplied).
Among the substantial changes not recognized by Justice McClellan was the addition of "negligence" to the wrongful acts or omissions for which damages were recoverable. The personal representative is limited to such actions as the testator/intestate could have maintained if death had not resulted. The testator/intestate could not have maintained an action to recover punitive damages for negligence if the negligence had not caused his death. East Tennessee, Va. & Ga. R.R. v. King, 81 Ala. 177, 183, 2 So. 152 (1886).
For some reason or reasons, the Court chose not to discuss this change but to opine that it was within the legislative competency to punish negligence as it could punish wantonness, willfulness, or intentional wrongdoing. It was not legislative competency, but legislative intent that was at issue; and this change was strong evidence that the Legislature intended to change the judicial mind set of the 19th Century that held that "the value of human life was so great as to be incapable of being estimated by money," King v. Henkie, supra, and that "to the cultivated and enlightened mind, looking at human life in the light of Christian religion as sacred, the idea of compensating its loss in money is revolting." Hyatt v. Adams, supra.
Construing the statute free of prior judicial interpretation, the Court in Richmond & D.R.R. v. Freeman, supra, 97 Ala. at 296, 11 So. at 802, was inclined to view the statute as primarily intending "to afford compensation to the next of kin of a person coming to his death through the wrong of another, and to allow the imposition of punitive damages only in those cases where they would have been recoverable had the injury fallen short of death." Thus, I am inclined to interpret the words of the statute in that same way.
The Legislature has not amended the statute since Richmond & D.R.R. v. Freeman, supra, to reject the Court's interpretation that the damages recoverable under what is now § 6-5-410 are only punitive. Should we then assume that the Court's interpretation was correct? If we do so, the assumption is based on the false premise that the correctness of statutory construction is measured by what the current Legislature desires, rather than by what the law as enacted meant.
In Jackson v. City of Florence, 294 Ala. 592, 598, 320 So.2d 68, 73 (1975), Justice *1062 Shores, writing for a majority of the Court, wrote:
"The city here argues that the failure of the legislature to act in this area constitutes its approval of the construction placed on its enactments by this court. It is equally arguable, as noted by Justice Currie, concurring specially in Holytz v. City of Milwaukee, 17 Wis.2d 26, 115 N.W.2d 618, 626 (1962), that they [the legislature] deferred to the supposed wisdom of the court, or else determined that the court should correct its own mistakes,' or as Judge Moremen of the Court of Appeals of Kentucky responded to the same argument in Haney v. City of Lexington, (Ky.), 386 S.W.2d 738, 741 (1964):
"`... It seems to us that an equally reasonable assumption is that the legislature might expect the courts themselves to correct an unjust rule which was judicially created....'
"The Supreme Court of New Jersey met the same argument in McAndrew v. Mularchuk, 33 N.J. 172, 193, 162 A.2d 820, 832 (1960), and said:
"`... But the limitation on the normal operation of respondeat superior was originally placed there by the Judiciary. Surely it cannot be urged successfully that an outmoded, inequitable, and artificial curtailment of a general rule of action created by the judicial branch of the government cannot or should not be removed by its creator....'
"And again, by the Supreme Court of Washington, in Pierce v. Yakima Valley Memorial Hospital Ass'n., 43 Wash.2d 162, 178, 260 P.2d 765, 774 (1953):
"`... We closed our courtroom doors without legislative help, and we can likewise open them....'
"We earnestly believe that the responsibility for correcting what is universally condemned as a bad rule of law rests with this court."
Justice Scalia, in his dissent in Johnson v. Transportation Agency, ___ U.S. ___, ___, 107 S.Ct. 1442, 1473, 94 L.Ed.2d 615 (1987), wrote:
"[O]ne must ignore rudimentary principles of political science to draw any conclusions regarding that intent from the failure to enact legislation. The `complicated check on legislation,' The Federalist No. 62, p. 378 (C. Rossiter ed. 1961), erected by our Constitution creates an inertia that makes it impossible to assert with any degree of assurance that congressional failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice."
There is substantially that same complicated check on legislation in the Legislature of Alabama as in the Congress of the United States.[10]
Mindful of the spectre of unconstitutionality that overshadows § 6-5-410 (Richmond & D.R.R. v. Freeman, supra, Aetna Life Insurance Co. v. Lavoie, supra) as it has been interpreted by the Court, and mindful that the words of the statute and not the judicial mind set of a previous time should be paramount in our interpretation of statutes, and to make certain that truth and not repose is my choice when there is a choice between the two, I interpret § 6-5-410 as primarily intending to afford *1063 compensation to the next of kin of a person coming to his or her death through the wrongful act, omission, or negligence of another and to allow punitive damages only in those cases where they would have been recoverable had the injury fallen short of death.
I would apply the principle of joint and several liability to compensatory damages in wrongful death cases, and would have no apportionment of compensatory damages among joint tortfeasors. In this way, the uncompensated victim has maximum assurance of receiving full compensation for all compensable damages sustained as a result of the wrongful acts, omissions, or negligence of all of the tort-feasors. If punitive damages are recoverable in wrongful death cases, I would have them apportioned among the joint tort-feasors in accordance with each defendant's degree of culpability.
Justice Shores, in Jackson v. City of Florence, supra, 294 Ala. at 598, 320 So.2d at 73, wrote:
"As strongly as we believe in the stability of the law, we also recognize that there is merit, if not honor, in admitting prior mistakes and correcting them."
Each Justice must decide what is a mistake that there is honor in admitting and correcting and of what we must say, "`Twill be recorded for a precedent'"[11] forever. I see as much honor in admitting and correcting this mistake, which, in my opinion, has caused unjust results in such cases as Carter v. City of Birmingham, supra, as in admitting and correcting those mistakes in Jackson v. City of Florence, supra; Jawad v. Granade, 497 So.2d 471 (Ala. 1986); and Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), which includes Sam Walter Foss's story of the precedential "primeval calf."

Maurice Evan Hare, in 1905, wrote:

"There once was a man who said `Damn!

It is borne in upon me I am

An engine that moves

In predestinate grooves,

I'm not even a bus, I'm a tram.'"
Since I do not wish to move in erroneous "predestinate grooves," I would hold that both compensatory and punitive damages can be recoverable in an Alabama wrongful death suit, that compensatory damages are not apportionable among joint tort-feasors, and that punitive damages are apportionable among joint tort-feasors.
Since wrongful death damages have been interpreted as being only punitive by prior decisions of this Court, it is evident that the parties to the releases intended for the $400,000 from Mrs. Tatum's physician and the $50,000 from the drug manufacturer to be punitive damages. Therefore, this should have no effect on any compensatory damages or punitive damages that a jury may award against Schering in the trial of this case. Neither party should be able to introduce such pro tanto releases. Therefore, the answer to certified question one should be "none". The answers to certified questions two and three should be "no."
It is noted, but not in answer to these certified questions, that the trial court has the discretion to inform the jury of the total amount of any compensatory settlement and to instruct the jury to subtract that figure from the full amount of compensatory damages sustained by a plaintiff. Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699, 702 (Ala.1982). Even though Bucyrus-Erie also permits a tort-feasor who is not a party to the release to plead a pro tanto release as a bar to the amount paid by the released tort-feasor or to place the release in evidence to show payment for the injury up to the amount shown in the release, this should not be permitted if the trial court determines that a portion of the amount paid pursuant to the release was for punitive damages, since I would apportion punitive damages, and, by apportionment, a tort-feasor should receive no benefit for any punitive damages paid by other tort-feasors.
NOTES
[1] A. Pope, An Essay on Criticism (1711) line 335:

"Be not the first by whom the new are tried nor yet the last to lay the old aside."
[2] W. Shakespeare, Julius Caesar, act I, scene iii, line 33:

"Indeed it is a strange-disposed time. But men may construe things after their fashion, Clean from the purpose of the things themselves."
[3] See Alaska Stat. § 09.55.580 (1983); Ariz.Rev. Stat.Ann. § 12-611 (1982); Ark.Stat.Ann. § 27-906 (1979); Cal.C.P.Code § 377 (West 1973); Colo.Rev.Stat. § 13-21-202 (1973); Fla. Stat.Ann. § 768.19 (West 1986); Ga.Code Ann. § 51-4-5 (1982); Hawaii Rev.Stat. § 663-3 (1985); Idaho Code § 5-311 (1979 & Supp. 1987); Ill.Rev.Stat. Ch. 70, § 1 (1985); Ind.Code Ann. § 34-1-1-2 (Burns 1986); Iowa Code § 633.336 (1987); Kan.Stat.Ann. § 60-1901 (1983); Ky.Rev.Stat.Ann. § 411.130 (Bobbs-Merrill 1972); Me.Rev.Stat.Ann.tit. 18-A, § 2-804 (1964); Md.C.J.Code Ann. § 3-902 (1984); Mich.Comp.Laws Ann. § 600.2922 (1986); Minn.Stat. § 573.02 (1986); Miss.Code Ann. § 11-7-13 (1972); Mo.Rev.Stat. § 537.080 (1986); Mont.Code Ann. § 27-1-513 (1986); Neb.Rev.Stat. § 30-809 (1985); Nev.Rev.Stat. § 41.085 (1986); N.J.Stat.Ann. § 2A: 31-1 (West 1952); N.M.Stat.Ann. § 41-2-3 (1986); N.Y.E.P. T. Law § 5-4.1 (McKinney 1981); N.C.Gen.Stat. § 28A-18-2 (1984); N.D.Cent.Code § 32-21-01 (1976); Ohio Rev.Code Ann. § 2125.01 (Page 1976); Okla.Stat.Ann.tit. 12, § 1053 (West 1981); Or.Rev.Stat. § 30.020 (1983); 42 Pa.Cons.Stat. Ann. § 8301 (Purdon 1982); R.I.Gen.Laws § 10-7-1 (1985); S.C.Code Ann. § 15-51-10 (Law.Co-op.1977); S.D.Codified Laws Ann. § 21-5-1 (1987); Tenn.Code Ann. § 20-5-106 (1980); Tex.Civ.Prac. & Rem.Code Ann. § 71.002 (Vernon 1986); Utah Code Ann. § 78-11-7 (1987); Vt.Stat.Ann.tit. 14, § 1491 (1974 & 1987 Supp.); Va. Code § 8.01-50 (1984); Wash.Rev.Code § 4.20.010 (1985); W.Va.Code § 55-7-5 (1981); Wis.Stat. § 895.03 (1985-1986); Wyo.Stat. § 1-38-101 (1977).
[4] Linge's Adm'r v. Alaska Treadwell Co., 3 Alaska 9 (1906); Nunez v. Nunez, 25 Ariz.App. 558, 545 P.2d 69 (1976); see Beaty v. Buckeye Fabric Finishing Co., 179 F.Supp. 688 (E.D.Ark.1959); In Re Riccomi's Estate, 185 Cal. 458, 197 P. 97 (1921); see Carr v. Pacific Tel. Co., 26 Cal.App. 3d 537, 103 Cal.Rptr. 120 (1972); Denver & R.G.R.R. v. Spencer, 27 Colo. 313, 61 P. 606 (1900), Kogul v. Sonheim, 150 Colo. 316, 372 P.2d 731 (1962); see also Barnhill v. Public Service Co., 649 P.2d 716 (Colo.Ct.App.1982), aff'd, 690 P.2d 1248 (Colo.1984); see Wadsworth v. Friend, 201 So.2d 641 (Fla.Dist.Ct.App.1967); Harden v. United States 485 F.Supp. 380 (S.D. Ga.1980), aff'd in part, vacated in part, 688 F.2d 1025 (5th Cir.1982); see Hudson v. Uwekoolani, 653 P.2d 783, 65 Hawaii 468 (1982); see Anderson v. Great Northern R.R., 15 Idaho 513, 99 P. 91 (1909); see Klawonn v. Mitchell, 105 Ill.2d 450, 86 Ill.Dec. 478, 475 N.E.2d 857 (1985), Trotter v. Moore, 113 Ill.App.3d 1011, 69 Ill.Dec. 653, 447 N.E.2d 1340 (1983), rev'd on other grounds, 101 Ill.2d 551, 82 Ill.Sec. 456, 468 N.E. 2d 1236 (1984); Consolidated Stone Co. v. Staggs, 164 Ind. 331, 73 N.E. 695 (1905); see Briner v. Hyslop, 337 N.W.2d 858 (Iowa 1983); see McCart v. Muir, 230 Kan. 618, 641 P.2d 384 (1982); Louisville & N.R.R. v. Kelly's Adm'x, 100 Ky. 421, 38 S.W. 852 (1897); Carrier v. Bornstein, 136 Me. 1, 1 A.2d 219 (1938), see Blanchette v. Miles, 139 Me. 70, 27 A.2d 396 (1942); see Weimer v. Hetrick, 309 Md. 536, 525 A.2d 643 (1987); see Keane v. Carolina Freight Carriers Corp., 70 Md.App. 298, 520 A.2d 1142 (1987), aff'd, 311 Md. 335, 534 A.2d 1337 (1988); Crystal v. Hubbard, 92 Mich.App. 240, 285 N.W.2d 66 (1979), rev'd on other grounds, 414 Mich. 297, 324 N.E.2d 869 (1982); see Larson v. Johns-Manville Sales Corp., 427 Mich. 301, 399 N.W.2d 1 (1986); Thoirs v. Pounsford, 210 Minn. 462, 299 N.W. 16 (1941); Gulf Transport Co. v. Allen, 209 Miss. 206, 46 So.2d 436 (1950); Caen v. Feld, 371 S.W.2d 209 (Mo.1963); see Torchia v. Burlington Northern, Inc., 174 Mont. 83, 568 P.2d 558 (1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978); Anderson v. Chicago B. & Q.R.R., 35 Neb. 95, 52 N.W. 840 (1892); McGarry v. United States, 370 F.Supp. 525 (D.Nev.1973), aff'd, 549 F.2d 587 (9th Cir.1976); Odlivak v. Elliott, 82 F.Supp. 607 (D.Del.1949); see also Cooper v. Shore Electric Co., 63 N.J.L. 558, 44 A. 633 (1899); Stang v. Hertz Corp, 81 N.M. 69, 463 P.2d 45 (1969), aff'd, 81 N.M. 348, 467 P.2d 14 (1970), rev'd on other grounds, 83 N.M. 730, 497 P.2d 732 (1972); Woodward v. Pancio, 65 A.D.2d 923, 410 N.Y.S.2d 454 (1978); Beck v. Carolina Power & Light Co., 57 N.C.App. 373, 291 S.E.2d 897, aff'd, 307 N.C. 267, 297 S.E.2d 397 (1982); Hyyti v. Smith, 67 N.D. 425, 272 N.W. 747 (1937); see Rubeck v. Huffman, 54 Ohio St.2d 20, 374 N.E.2d 411 (1978); E.G. Nicholas Const. Co. v. State Indus. Commission, 207 Okla. 428, 250 P.2d 221 (1952); see Arrow Transportation Co. v. Northwest Grocery Co., 258 Or. 363, 482 P.2d 519 (1971); Manning v. Capelli, 270 Pa.Super. 207, 411 A.2d 252 (1979); see McCabe v. Narragansett Elec. Lighting Co., 26 R.I. 427, 59 A. 112 (1904); see Mishoe v. Atlantic Coast Line R.R., 186 S.C. 402, 197 S.E. 97 (1938); see Brickman v. Southern Ry., 74 S.C. 306, 54 S.E. 553 (1906); see Hodkinson v. Parker, 70 S.D. 272, 16 N.W.2d 924 (1944); see Memphis St. Ry. v. Cooper, 203 Tenn. 425, 313 S.W.2d 444 (1958); see Tarrant County Hosp. Dist. v. Jones, 664 S.W.2d 191 (Tex.Ct.App.1984); see also Stanford v. McLean Trucking Co., 506 F.Supp. 1252 (E.D.Tex.1981); Morrison v. Perry, 104 Utah 151, 140 P.2d 772 (1943); see Bassett v. Vermont Tax Dept., 135 Vt. 257, 376 A.2d 731 (1977); see also Allen v. Moore, 109 Vt. 405, 199 A. 257 (1938); Cassady v. Martin, 220 Va. 1093, 266 S.E.2d 104 (1980); Kramer v. Portland Seattle Auto Freight, 43 Wash.2d 386, 261 P.2d 692 (1953); Morris v. Baltimore & O.R.R., 107 W.Va. 97, 147 S.E. 547 (1929); see Yeater v. Jennings Oil Co., 75 W.Va. 346, 84 S.E. 904 (1914); Harris v. Kelley, 70 Wis.2d 242, 234 N.W.2d 628 (1975); see Ashley v. Read Const. Co., 195 F.Supp. 727 (D.Wyo.1961); see also Coliseum Motor Co. v. Hester, 43 Wyo. 298, 3 P.2d 105 (1931).
[5] Alaska Stat. § 09.55.580 (1983); Ariz.Rev.Stat. Ann. § 12-611 (1982); Ark.Stat.Ann. § 27-906 (1979); Cal.C.P.Code § 377 (West 1973); Colo. Rev.Stat. § 13-21-202(1973); see Carr v. Pacific Tel. Co., 26 Cal.App.3d 537, 103 Cal.Rptr. 120 (1972); Fla.Stat.Ann. § 768.19 (West 1986); Ga. Code Ann. § 51-4-5 (1982); Hawaii Rev.Stat. § 663-3 (1985); Idaho Code § 5-311 (1979 & Supp. 1987); Ill.Rev.Stat. Ch. 70, § 1 (1985); Ky.Rev.Stat.Ann. § 411.130 (Bobbs-Merrill 1972); Me.Rev.Stat.Ann.tit. 18-A § 2-804 (1964); Md.C.J.Code Ann. § 3-902 (1984); Mass.Ann.Laws ch. 229, § 2 (Law.Co-op.1986); Mich.Comp.Laws Ann. § 600.2922 (1986); Miss. Code Ann. § 11-7-13 (1972); Mo.Rev.Stat. § 537.080 (1986); Mont.Code Ann. § 27-1-513 (1986); Neb.Rev.Stat. § 30-809 (1985); Nev. Rev.Stat. § 41.085 (1986); N.J.Stat.Ann. § 2A:31-1 (West 1952); N.M.Stat.Ann. § 41-2-3 (1986); N.Y.E.P.T. Law § 5-4.1 (McKinney 1981); N.C.Gen.Stat. § 28A-18-2 (1984); N.D. Cent.Code § 32-21-01 (1976); Ohio Rev.Code Ann. § 2125.01 (Page 1976); 42 Pa.Cons.Stat. Ann. § 8301 (Purdon 1982); R.I.Gen.Laws § 10-7-1 (1985); S.C.Code Ann. § 15-51-10 (Law.Co-op.1977); S.D.Codified Laws Ann. § 21-5-1 (1987); Tex.Civ.Prac. & Rem.Code Ann. § 71.002 (Vernon 1986); Utah Code Ann. § 78-11-7 (1987); Vt.Stat.Ann.tit. 14, § 1491 (1974 & 1987 Supp.); Va.Code § 8.01-50 (1984); Wash.Rev.Code § 4.20.010 (1985); W.Va.Code § 55-7-5 (1981); Wis.Stat. § 895.03 (1985-1986); Wyo.Stat. § 1-38-101 (1977).
[6] Linge's Adm'r v. Alaska Treadwell Co., 3 Alaska 9 (1906); Nunez v. Nunez, 25 Ariz.App. 558, 545 P.2d 69 (1976); see Beaty v. Buckeye Fabric Finishing Co., 179 F.Supp. 688 (E.D.Ark.1959); In Re Riccomi's Estate, 185 Cal. 458, 197 P. 97 (1921); see Carr v. Pacific Tel. Co., 26 Cal.App. 3d 537, 103 Cal.Rptr. 120 (1972); Denver & R.G.R.R. v. Spencer, 27 Colo. 313, 61 P. 606 (1900), Kogul v. Sonheim, 150 Colo. 316, 372 P.2d 731 (1962); see also Barnhill v. Public Service Co., 649 P.2d 716 (Colo.Ct.App.1982), aff'd, 690 P.2d 1248 (Colo.1984); Lynch v. Lynch, 39 Del. 1, 195 A. 799 (Super.Ct.1937), Benson v. Lynch, 404 F.Supp. 8 (D.Del.1975); see Wadsworth v. Friend, 201 So.2d 641 (Fla. Dist.Ct.App.1967); Harden v. United States, 485 F.Supp. 380 (S.D.Ga.1980), aff'd in part, vacated in part, 688 F.2d 1025 (5th Cir.1982); see Hudson v. Uwekoolani, 653 P.2d 783, 65 Hawaii 468 (1982); see Anderson v. Great Northern R.R., 15 Idaho 513, 99 P. 91 (1909); see Klawonn v. Mitchell, 105 Ill.2d 450, 86 Ill.Dec. 478, 475 N.E.2d 857 (1985), Trotter v. Moore, 113 Ill.App. 3d 1011, 69 Ill.Dec. 653, 447 N.E.2d 1340 (1983), rev'd on other grounds, 101 Ill.2d 551, 82 Ill. Dec. 456, 468 N.E.2d 1236 (1984); Louisville & N.R.R. v. Kelly's Adm'x, 100 Ky. 421, 38 S.W. 852 (1897); Carrier v. Bornstein, 136 Me. 1, 1 A.2d 219 (1938), see Blanchette v. Miles, 139 Me. 70, 27 A.2d 396 (1942); see Weimer v. Hetrick, 309 Md. 536, 525 A.2d 643 (1987); see Keane v. Carolina Freight Carriers Corp., 70 Md.App. 298, 520 A.2d 1142 (1987), aff'd, 311 Md. 335, 534 A.2d 1337 (1988); Putnam v. Savage, 244 Mass. 83, 138 N.E. 808 (1923); Bullard v. Central V.R.R., 565 F.2d 193 (1st Cir.1977); Crystal v. Hubbard, 92 Mich.App. 240, 285 N.W.2d 66 (1979), rev'd on other grounds, 414 Mich. 297, 324 N.E.2d 869 (1982); see Larson v. Johns-Manville Sales Corp., 427 Mich. 301, 399 N.W.2d 1 (1986); Gulf Transport Co. v. Allen, 209 Miss. 206, 46 So.2d 436 (1950); Caen v. Feld, 371 S.W.2d 209 (Mo.1963); see Torchia v. Burlington Northern, Inc., 174 Mont. 83, 568 P.2d 558 (1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 770, 54 L.Ed.2d 783 (1978); Anderson v. Chicago B. & Q.R.R., 35 Neb. 95, 52 N.W. 840 (1892); McGarry v. United States, 370 F.Supp. 525 (D.Nev.1973), aff'd, 549 F.2d 587 (9th Cir.1976); Odlivak v. Elliott, 82 F.Supp. 607 (D.Del.1949); see also Cooper v. Shore Electric Co., 63 N.J.L. 558, 44 A. 633 (1899); Stang v. Hertz Corp, 81 N.M. 69, 463 P.2d 45 (1969), aff'd, 81 N.M. 348, 467 P.2d 14 (1970), rev'd on other grounds, 83 N.M. 730, 497 P.2d 732 (1972); Woodward v. Pancio, 65 A.D.2d 923, 410 N.Y.S.2d 454 (1978); Beck v. Carolina Power & Light Co., 57 N.C.App. 373, 291 S.E.2d 897, aff'd, 307 N.C. 267, 297 S.E.2d 397 (1982); Hyyti v. Smith, 67 N.D. 425, 272 N.W. 747 (1937); see Rubeck v. Huffman, 54 Ohio St.2d 20, 374 N.E.2d 411 (1978); Manning v. Capelli, 270 Pa.Super. 207, 411 A.2d 252 (1979); see McCabe v. Narragansett Elec. Lighting Co., 26 R.I. 427, 59 A. 112 (1904); see Mishoe v. Atlantic Coast Line R.R., 186 S.C. 402, 197 S.E. 97 (1938); see Brickman v. Southern Ry., 74 S.C. 306, 54 S.E. 553 (1906); see Hodkinson v. Parker, 70 S.D. 272, 16 N.W.2d 924 (1944); see Tarrant County Hosp. Dist. v. Jones, 664 S.W.2d 191 (Tex.Ct.App.1984); see also Stanford v. McLean Trucking Co., 506 F.Supp. 1252 (E.D.Tex. 1981); Morrison v. Perry, 104 Utah 151, 140 P.2d 772 (1943); see Bassett v. Vermont Tax Dept., 135 Vt. 257, 376 A.2d 731 (1977); see also Allen v. Moore, 109 Vt. 405, 199 A. 257 (1938); Cassady v. Martin, 220 Va. 1093, 266 S.E.2d 104 (1980); Kramer v. Portland Seattle Auto Freight, 43 Wash.2d 386, 261 P.2d 692 (1953); Morris v. Baltimore & O.R.R., 107 W.Va. 97, 147 S.E. 547 (1929); see Yeater v. Jennings Oil Co., 75 W.Va. 346, 84 S.E. 904 (1914); Harris v. Kelley, 70 Wis.2d 242, 234 N.W.2d 628 (1975); see Ashley v. Read Const. Co., 195 F.Supp 727 (D.Wyo. 1961); see also Coliseum Motor Co. v. Hester, 43 Wyo. 298, 3 P.2d 105 (1931).
[7] Alaska Stat. § 09.55.580 (1983); Ind.Code Ann. § 34-1-1-2 (Burns 1986); Kan.Stat.Ann. § 60-1901 (1983); Minn.Stat. § 573.02 (1986); Miss.Code Ann. § 11-7-13 (1972); Okla.Stat. Ann.tit. 12. § 1053 (West 1981); Or.Rev.Stat. § 30.020 (1983); Tenn.Code Ann. § 20-5-106 (1980).
[8] Ariz.Rev.Stat.Ann. §§ 12-611 (1982); Ark.Stat. Ann. § 27-906 (1979); Colo.Rev.Stat. § 13-21-202 (1973); Fla.Stat.Ann. § 768.19 (West 1986); Hawaii Rev.Stat. § 663-3 (1985); Ill.Rev.Stat. Ch. 70, § 1 (1985); Me.Rev.Stat. Ann.tit. 18-A § 2-804 (1964); Md.C.J.Code Ann. § 3-902 (1984); Mo.Rev.Stat. § 537.080 (1986); Neb.Rev.Stat. § 30-809 (1985); N.J.Stat.Ann. § 2A: 31-1 (West 1952); N.M.Stat.Ann. § 41-2-3 (1986); N.Y.E.P.T. Law § 5-4.1 (McKinney 1981); N.C.Gen.Stat. § 28A-18-2 (1984); N.D.Cent.Code § 32-21-01 (1976); Ohio Rev.Code Ann. § 2125.01 (Page 1976); R.I.Gen. Laws § 10-7-1 (1985); S.C.Code Ann. § 15-51-10 (Law.Co-op.1977); S.D.Codified Laws Ann. § 21-5-1 (1987); Tex.Civ.Prac. & Rem.Code Ann. § 71.002 (Vernon 1986); Vt. Stat.Ann.tit. 14, § 1491 (1974 & 1987 Supp.); Va.Code § 8.01-50 (1984); Wash.Rev.Code § 4.20.010 (1985); W.Va.Code § 55-7-5 (1981); Wis.Stat. § 895.03 (1985-1986); Wyo.Stat. § 1-38-101 (1977).
[9] Linge's Adm'r v. Alaska Treadwell Co., 3 Alaska 9 (1906); Nunez v. Nunez, 25 Ariz.App. 558, 545 P.2d 69 (1976); see Beaty v. Buckeye Fabric Finishing Co., 179 F.Supp. 688 (E.D.Ark. 1959); Denver & R.G.R.R. v. Spencer, 27 Colo. 313, 61 P. 606 (1900), Kogul v. Sonheim, 150 Colo. 316, 372 P.2d 731 (1962); see also Barnhill v. Public Service Co., 649 P.2d 716 (Colo.Ct.App.1982), aff'd, 690 P.2d 1248 (Colo.1984); Lynch v. Lynch, 39 Del. 1, 195 A. 799 (Super.Ct.1937), Benson v. Lynch, 404 F.Supp. 8 (D.Del.1975); see Wadsworth v. Friend, 201 So.2d 641 (Fla. Dist.Ct.App.1967); see Hudson v. Uwekoolani, 653 P.2d 783, 65 Hawaii 468 (1982); see Klawonn v. Mitchell, 105 Ill.2d 450, 86 Ill.Dec. 478, 475 N.E.2d 857 (1985), Trotter v. Moore, 113 Ill.App.3d 1011, 69 Ill.Dec. 653, 447 N.E.2d 1340, (1983), rev'd on other grounds, 101 Ill.2d 551, 82 Ill.Dec. 456, 468 N.E.2d 1236 (1984); Consolidated Stone Co. v. Staggs, 164 Ind. 331, 73 N.E. 695 (1905); see McCart v. Muir, 230 Kan. 618, 641 P.2d 384 (1982); Carrier v. Bornstein, 136 Me. 1, 1 A.2d 219 (1938), see Blanchette v. Miles, 139 Me. 70, 27 A.2d 396 (1942); see Weimer v. Hetrick, 309 Md. 536, 525 A.2d 643 (1987); see Keane v. Carolina Freight Carriers Corp., 70 Md. App. 298, 520 A.2d 1142 (1987), aff'd, 311 Md. 335, 534 A.2d 1337 (1988); Thoirs v. Pounsford, 210 Minn. 462, 299 N.W. 16 (1941); Caen v. Feld, 371 S.W.2d 209 (Mo.1963); Anderson v. Chicago B. & Q.R.R., 35 Neb. 95, 52 N.W. 840 (1892); Odlivak v. Elliott, 82 F.Supp. 607 (D.Del. 1949); see also Cooper v. Shore Electric Co., 63 N.J.L. 558, 44 A. 633 (1899); Stang v. Hertz Corp., 81 N.M. 69, 463 P.2d 45 (1969), aff'd, 81 N.M. 348, 467 P.2d 14 (1970), rev'd on other grounds, 83 N.M. 730, 497 P.2d 732 (1972); Woodward v. Pancio, 65 A.D.2d 923, 410 N.Y.S. 2d 454 (1978); Beck v. Carolina Power & Light Co., 57 N.C.App. 373, 291 S.E.2d 897, aff'd, 307 N.C. 267, 297 S.E.2d 397 (1982); Hyyti v. Smith, 67 N.D. 425, 272 N.W. 747 (1937); see Rubeck v. Huffman, 54 Ohio St.2d 20, 374 N.E.2d 411 (1978); see McCabe v. Narragansett Elec. Lighting Co., 26 R.I. 427, 59 A. 112 (1904); see Mishoe v. Atlantic Coast Line R.R., 186 S.C. 402, 197 S.E. 97 (1938); see Brickman v. Southern Ry., 74 S.C. 306, 54 S.E. 553 (1906); see Hodkinson v. Parker, 70 S.D. 272, 16 N.W.2d 924 (1944); see Tarrant County Hosp. Dist. v. Jones, 664 S.W.2d 191 (Tex.Ct.App.1984); see also Stanford v. McLean Trucking Co., 506 F.Supp. 1252 (E.D.Tex. 1981); see Bassett v. Vermont Tax Dept., 135 Vt. 257, 376 A.2d 731 (1977); see also Allen v. Moore, 109 Vt. 405, 199 A. 257 (1938); Cassady v. Martin, 220 Va. 1093, 266 S.E.2d 104 (1980); Kramer v. Portland Seattle Auto Freight, 43 Wash.2d 386, 261 P.2d 692 (1953); Morris v. Baltimore & O.R.R., 107 W.Va. 97, 147 S.E. 547 (1929); see Yeater v. Jennings Oil Co., 75 W.Va. 346, 84 S.E. 904 (1914); Harris v. Kelley, 70 Wis.2d 242, 234 N.W.2d 628 (1975); see Ashley v. Read Const. Co., 195 F.Supp 727 (D.Wyo. 1961); see also Coliseum Motor Co. v. Hester, 43 Wyo. 298, 3 P.2d 105 (1931).
[10] This Court is aware that several "Tort Reform" bills were enacted by the Legislature and signed by the Governor in 1987. None purported to readopt § 6-5-410, Code 1975. The references to § 6-5-410 or to death actions in these Acts (Act No. 87-183; Act No. 87-185, § 1(a), § 10, and the severability provision in § 11; Act 87-187 (§ 1; and Act 87-189, § 7, Acts of Alabama 1987), send mixed signals. Section 1 of Act 87-187 contains the words "[i]n all civil actions where damages for any medical or hospital expenses are claimed and are legally recoverable for personal injury or death" (emphasis supplied). This could be interpreted as expressing the legislative intention that compensatory damages, when claimed, should be allowed in wrongful death actions. Section 1(a) and § 10, Act No. 87-185, except civil actions for wrongful death pursuant to § 6-5-410 from the changes made regarding punitive damages in other tort actions, subject to the severability provision of § 11. This could be interpreted as expressing the legislative intention that only punitive damages could be recovered in § 6-5-410 actions.
[11] Portia in W. Shakespeare's The Merchant of Venice, act IV, scene i, line 218.